# STATE OF LOUISIANA
## COURT OF APPEAL, THIRD CIRCUIT

## 16-220

STATE OF LOUISIANA

VERSUS

STEVEN BLUNT
AKA STEVEN L. BLUNT

**********

APPEAL FROM THE
FIFTEENTH JUDICIAL DISTRICT COURT
PARISH OF ACADIA, NO. CR #81-438
HONORABLE KRISTIAN DENNIS EARLES, DISTRICT JUDGE

**********

## ELIZABETH A. PICKETT
## JUDGE

**********

Court composed of Elizabeth A. Pickett, Billy Howard Ezell, and Phyllis M. Keaty, Judges.

**AFFIRMED.**

**Keith A. Stutes**
**District Attorney - Fifteenth Judicial District Court**
**Burleigh G. Doga**
**Assistant District Attorney**
**P. O. Box 3306**
**Lafayette, LA 70502-3306**
**(337) 232-5170**
**COUNSEL FOR APPELLEE:**
	**State of Louisiana**

**Chad M. Ikerd**
**Louisiana Appellate Project**
**P.O.Box 2125**
**Lafayette, LA 70502**
**(225) 806-2930**
**COUNSEL FOR DEFENDANT-APPELLANT:**
**Steven Blunt**

**PICKETT, Judge.**

## FACTS

D.C.,[1] a fifteen-year-old girl, reported that she was forced to have sexual intercourse on two occasions with the defendant, Steven Blunt, a forty-four-year-old man, while she was staying with the defendant's stepdaughter in Rayne, Louisiana, in July 2013.

On September 26, 2013, the defendant was charged by bill of information with two counts of forcible rape against a fifteen year old, D.C., a violation of La.R.S. 14:42.1.[2] The defendant pled not guilty to the charges on October 3, 2013. After a trial by jury held December 8 and 9, 2015, the defendant was found guilty as charged on both counts by a unanimous jury. On December 14, 2015, the trial judge sentenced the defendant to thirty years at hard labor on each count, to run consecutively to one another. A Motion to Reconsider Sentence was filed on December 15, 2015, and was denied without a hearing on December 23, 2015. The defendant also filed a Motion for New Trial on December 15, 2015, which was denied without a hearing on December 23, 2015.

The defendant filed a Motion for Appeal and Designation of Record on January 4, 2016, which was granted on January 5, 2016. The defendant filed an appellate brief, asserting two assignments of error.

## ASSIGNMENTS OF ERROR

1. The trial court erred by not granting Steven Blunt's Motion for a New Trial because there was insufficient evidence to support a conviction on both counts of forcible rape. The evidence tended to prove that there was no force involved and there was more likely than not consent between the parties.

---

[1] In accordance with La.R.S. 46:1844(W), the victim's initials will be used.

[2] We note that "forcible rape" was renamed "second degree rape" by 2015 La. Acts No. 184, § 1.

2. The trial court abused its sentencing discretion by sentencing Steven Blunt to consecutive sentences for what was alleged to be one continuous act.

## ERRORS PATENT

In accordance with La.Code Crim.P. art. 920, all appeals are reviewed by this court for errors patent on the face of the record. After reviewing the record, we find no errors patent.

## ASSIGNMENT OF ERROR NUMBER ONE

In this assignment of error, the defendant asserts that the trial court erred in denying his motion for new trial since the evidence, although sufficient to support a finding of consensual sex, was insufficient to support the jury's verdicts. Specifically, the defendant contends that the evidence "tended to prove that there was no force involved and there was more likely than not consent between the parties."

*Standard of Review*

This court has stated the following regarding the standard for reviewing a claim of insufficient evidence:

> The standard of review in a sufficiency of the evidence claim is "whether, viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found proof beyond a reasonable doubt of each of the essential elements of the crime charged." *State v. Leger,* 05–11, p. 91 (La.7/10/06), 936 So.2d 108, 170, *cert. denied,* 549 U.S. 1221, 127 S.Ct. 1279, 167 L.Ed.2d 100 (2007) (citing *Jackson v. Virginia,* 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979); *State v. Captville,* 448 So.2d 676, 678 (La.1984)). The *Jackson* standard of review is now legislatively embodied in La.Code Crim.P. art. 821. It does not allow the appellate court "to substitute its own appreciation of the evidence for that of the fact-finder." *State v. Pigford,* 05–477, p. 6 (La.2/22/06), 922 So.2d 517, 521 (citing *State v. Robertson,* 96–1048 (La.10/4/96), 680 So.2d 1165; *State v. Lubrano,* 563 So.2d 847, 850 (La.1990)). The appellate court's function is not to assess the credibility of witnesses or reweigh the evidence. *State v. Smith,* 94–3116 (La.10/16/95), 661 So.2d 442.

2

The factfinder's role is to weigh the credibility of witnesses. *State v. Ryan,* 07–504 (La.App. 3 Cir. 11/7/07), 969 So.2d 1268. Thus, other than ensuring the sufficiency evaluation standard of *Jackson,* "the appellate court should not second-guess the credibility determination of the trier of fact," but rather, it should defer to the rational credibility and evidentiary determinations of the jury. *Id.* at 1270 (quoting *State v. Lambert,* 97–64, pp. 4–5 (La.App. 3 Cir. 9/30/98), 720 So.2d 724, 726–27). Our supreme court has stated:

> However, an appellate court may impinge on the fact finder's discretion and its role in determining the credibility of witnesses "only to the extent necessary to guarantee the fundamental due process of law." *State v. Mussall,* 523 So.2d 1305, 1310 (La.1988). In determining the sufficiency of the evidence supporting a conviction, an appellate court must preserve " 'the factfinder's role as weigher of the evidence' by reviewing 'all of the evidence . . . in the light most favorable to the prosecution.' " *McDaniel v. Brown,* 558 U.S. [120], [134], 130 S.Ct. 665, 674, 175 L.Ed.2d 582 (quoting *Jackson v. Virginia,* 443 U.S. 307, 319, 99 S.Ct. 2781, 2789, 61 L.Ed.2d 560 (1979)). When so viewed by an appellate court, the relevant question is whether, on the evidence presented at trial, "*any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson,* 443 U.S. at 319, 99 S.Ct. at 2789. Applied in cases relying on circumstantial evidence, . . . this fundamental principle of review means that when a jury "reasonably rejects the hypothesis of innocence presented by the defendant[ ], that hypothesis falls, and the defendant is guilty unless there is another hypothesis which raises a reasonable doubt." *State v. Captville,* 448 So.2d 676, 680 (La.1984).

*State v. Strother,* 09–2357, pp. 10–11 (La.10/22/10), 49 So.3d 372, 378 (alteration in original).

*State v. Francis*, 12-1221, pp. 6-7 (La.App. 3 Cir. 4/3/13), 111 So.3d 529, 533, *writ denied*, 13-1253 (La. 11/8/13), 125 So.3d 449.

*State's Evidence*

The first witness to testify for the state was Detective Richard Gray of the Rayne Police Department. Detective Gray was informed that a sixteen-year-old girl claimed that she was raped on two occasions. Detective Gray later learned that

3

the girl was actually fifteen years old. Evidence collected included a pair of the victim's underwear, shorts and a white towel. When Detective Gray asked the defendant if he had sex with the victim, the defendant responded, "Not to my knowledge." The defendant admitted to drinking Vodka and Sprite the night before. The defendant remembered checking on "the girls" during the night but did not remember anything else. After receiving the defendant's consent, Detective Gray obtained a buccal swab and pubic hair for DNA analysis. According to the detective, the victim was transported to the hospital where a Sexual Assault Nurse Examiner (SANE) nurse conducted a forensic examination.

On cross-examination, Detective Gray was asked why he charged the defendant with forcible rape. Detective Gray responded, "The victim stated that Mr. Blunt had given her a substance, which she wasn't sure what it was, and we felt that was an element of the crime." Although Detective Gray searched the defendant's house, he did not recall finding a gun. Detective Gray also testified that he did not see marks or bruises on the victim when he spoke with her. Detective Gray testified that the victim appeared credible to him and did not appear to be under the influence of any drugs or alcohol. Finally, Detective Gray testified he found it odd that the defendant did not deny having sex with the victim.

On re-direct, Detective Gray was asked whether the victim said anything to him regarding violence. The detective responded, "At one point she said that she was fearful for her family, that he said he would kill her family. And the nurse told me there was trauma." The detective also read the following from the affidavit of probable cause he prepared:

> The victim was examined by a forensic nurse who discovered a laceration on the posterior fourchette of the vagina and the vagina wall, which is consistent with recent trauma or intercourse. The

4

victim told police officers that she was a virgin before the incident occurred.

The next witness, Bethany Harris, was accepted as an expert in DNA analysis and testing. Ms. Harris testified that she received a sexual assault kit containing samples taken from the victim. Among other items, the kit included external genital swabs taken from the victim as well as a pair of panties. Additionally, Ms. Harris received buccal swabs taken from the defendant. According to Ms. Harris, seminal fluid was found on the victim's external genital swabs and the victim's panties. DNA analysis performed on the sample from the victim's external genital swab showed a mixed DNA profile, meaning there was DNA present from more than one person. According to Ms. Harris, "the profile from the major DNA contributor on those external genital swabs matched the DNA profile obtained from Mr. Blunt's reference sample." The victim could not be excluded as the source of the minor contributor profile.

Ms. Rebecca Havlik, the SANE nurse that examined the victim, was accepted as an expert in the "field of sexual assault evidence collection and opinions in regards to that." When asked to describe the victim's injuries, Ms. Havlik testified as follows:

> The patient had a number of injuries that I noted when I did her pelvic exam. First, she had a hematoma, some swelling and edema, which is swelling of her hymenal tissue. A hematoma is a collection of blood that can occur. Injuries are commonly found on the hymenal tissue about twenty-nine percent (29%) of the time in a sexual assault. Okay? And she had a hematoma that extended – if you are picturing the vaginal introitus, external genitalia, you have your labia majora, which are the outer lips; you have the labia minora, which are the inner lips; you have the vaginal introitus, which is the opening to the vagina, and then you can have hymenal tissue. Even women, older women have hymenal tissue. It's usually formed into a redundant hymen. That hymenal tissue can still become damaged with hematomas, swelling, that kind of thing. She had swelling and a hematoma that extended from – if you're looking at the genitalia, you

think of a clock face. Okay? So, she had a hematoma on her hymen from 3:00 to about 5:00. All right? She also had a very large laceration on her posterior fourchette and fossa navicularis.

Ms. Havlik defined a hematoma as a collection of blood and an edema as swelling. According to Ms. Havlik, a hematoma and edema are indicative of trauma. When asked if it was usual to have such "trauma" in "everyday sex," Ms. Havlik responded, "No, it's not usual." Ms. Havlik further testified that it is usually indicative of blunt force trauma in the vaginal area. Ms. Havlik defined "laceration" as "a tearing of the skin" and stated that the victim had a "significant" laceration. According to Ms. Havlik, the entire area was ripped from the posterior fourchette up into the fossa navicularis.

Ms. Havlik described the victim's laceration as one of the worst she had seen in five years. At the time she examined the victim, Ms. Havlik had examined approximately fifty patients, and at the time of trial she had examined approximately 135. When asked if the victim's age (fifteen) made a difference in the amount of force necessary to cause her injuries, Ms. Havlik responded, "No." The hematoma was not as substantial a finding as the laceration. During her exam of the victim, Ms. Havlik noticed a milky substance in the vaginal vault and another laceration on the left side of the vaginal wall. Ms. Havlik opined that the victim's injuries were caused by blunt force trauma consistent with assault. Ms. Havlik further testified that the victim's injuries were some of the worst she has seen in her practice.

When asked if she formed any opinion as to the positioning of the bodies of the victim and the defendant during intercourse, Ms. Havlik responded:

> Generally, that injury we find with a mounting or a straddle position, meaning that the suspect is on top and the patient is on the bottom, similar to the missionary position. What happens is, during an assault

the suspect goes to enter the patient and they hit that skin. When they do that the skin gives a little bit, but if there's an extreme amount of pressure it tears. So, this the area during a sexual assault that is injured the most common. Okay? About seventy percent (70%) of the time we will see injury to this area.

When asked if she would expect to see the type of lacerations the victim suffered in a woman after having sexual intercourse with a man in the missionary position, Ms. Havlik said, "No[,]" and explained:

A:    First of all, the patient is young. Okay? Maybe in an older woman that has vaginal tissue that's atrophied, it's not as elastic, it's possible even with intercourse that that would occur. This is a young patient. It should not occur. Secondly, generally when intercourse is occurring both individuals are participating. The woman will generally do a pelvic tilt to accept their partner. Okay? When they do that, the likelihood of that partner hitting this tissue and with such force to tear it, is not very likely.

Q:    So, hypothetically, if you have a fifteen (15) year old young woman - - (interrupted)

A:    Uh-huh (yes).

Q:    - - that is involved in a sexual act where she's cooperating - - Is this a subconscious thing on the tilting of the pelvic [sic]; is that subconscious or is that something that a woman has to think about to do?

A:    It's mainly subconscious.

Q:    It's mainly subconscious?

A:    Uh-huh (yes).

Q:    And the fact that the tilting didn't occur, what does that indicate to you that the tilting of the woman's pelvis did not occur? What did that indicate to you in terms of - - (interrupted)

A:    Well, I can't say for certainty that it didn't, I'm just stating that the injury that was sustained is consistent with a mounting injury.

Q:    A mounting entry. And mounting entry as opposed to a missionary style sex, what's the difference?

A: A mounting injury means that there was some force, substantial force to cause that tissue to tear. And it's generally seen when the patient is not an active participant.

Q: Not an active participant?

A: Yes.

Q: Generally?

A: Yes.

Q: And your findings are consistent with that opinion?

A: Yes.

On cross-examination, Ms. Havlik testified that she could not determine from which of the two incidents of sexual assault the injuries were sustained. Ms. Havlik admitted that she could not say if the sex was consensual or non-consensual. Ms. Havlik opined that intercourse was painful for the victim. Since she works with an Obstetrician-Gynecologist as a nurse practitioner, Ms. Havlik stated that she could tell the difference between normal and abnormal intercourse. Ms. Havlik explained:

A: I can better understand what normal from abnormal looks like when it comes to external genitalia, vaginal area, cervix. I cannot tell you a guess with one hundred percent (100%) certainty that this was consensual versus sexual assault.

On re-direct, Ms. Havlik explained how her findings were consistent with the history given:

Okay. If you look at form "2B", it talks about any force that was used. She reported that he held her down by her shoulders on the floor so she could not get up. In the narrative the assault that took place on the 28th, per patient report, around 2:00 in the morning. She states that he forced her on the floor, took her clothes off, she was trying to get up, he was holding her down. He took his penis out and put it in her and told her that he wanted to eat her p---y. These are both examples of force that are consistent with the injury that was found.

8

Finally, on re-cross examination, Ms. Havlik acknowledged that she found no marks or bruises on the victim that would indicate the defendant held her down.

D.C., the victim, testified that her birthdate was May 15, 1998, that she was seventeen at the time of trial, and that she was fifteen in July, 2013. According to the victim, in 2013, the defendant was married to the mother of the victim's best friend, A. In July 2013, the victim and A. decided to spend three days at the defendant's residence in Rayne. During these three days, the victim met the defendant for the first time. The victim slept with A. in A.'s room. On Thursday, July 25, 2013, the first night the victim slept at the Blunt residence in Rayne, the victim asked the defendant for a pill for a headache. The defendant gave the victim a pill that helped with her headache. The victim and A. went to sleep in A.'s bedroom around midnight. When asked if anything happened that night, the victim testified that she felt a heavy mass on her and woke up to find the defendant on top of her. According to the victim, they were in the bedroom of A.'s little brother. The little brother was not in his bedroom because he was in the bed with his mom. The victim testified that she told the defendant to get off of her, but the defendant said, "Shh, don't tell nobody. If you tell anybody I'll kill everybody in the house." The victim stated that her genital area was burning because the defendant had his penis inserted into her vagina. According to the victim, she had never had sex before. When asked to describe what she was feeling at that time, the victim testified:

A: (Witness crying.) I was scared. I was shocked and scared.

Q: You testified – what did he say again, as far as warning you of something?

A: He said if I told anyone he would kill us all in the house.

Q: Kill everybody in the house?

A: (Witness nods, indicating yes.)

Q: Were you terrified?

A: (Witness crying.) Yes, sir.

Q: Did you think about screaming?

A: No, sir. I was scared.

Q: Aside from his doing this, what made you fearful of him when he said, "I'll kill everybody."?

A: Because he was so big and he was an ex-cop.

Q: He's an ex-cop?

A: Yes, sir.

Q: Okay. He was a police officer down here or up in Ouachita Parish?

A: Ouachita Parish.

Q: And, again, I'm not trying to put words in your mouth, but you were fearful that he had the ability to carry that out?

A: (Witness crying.) Yes, sir.

. . . .

**BY MR. DOGA – CONTINUED:**

Q: When you say you were terrified, tell me what that means to you at the time, what you were feeling at the time.

**BY THE WITNESS:**

A: (Witness crying.) I was scared. I didn't know what do, and if I did anything I didn't know what would happen.

Q: Now, during the time that the sexual intercourse was taking place, at that time, what were you doing?

A: Just laying there still on my back.

10

Q: Other than laying still on your back did you do anything during the act to participate?

A: No, sir.

When it was over, the defendant went in to the bathroom, and the victim ran to A.'s room. The victim said she tried to wake A. to tell her but A. would not wake up. When asked to describe what she was afraid of, the victim answered:

A: (Witness crying.) I was fearful of him. He's so big, and I'm not that big at all. And he was an ex-cop, so he has a lot of training and experience behind him.

The victim repeated that the defendant told her that he would kill everyone in the house if she told anyone. Although the victim had a cell phone, she did not text her mother to tell her what happened. The victim said she was afraid to talk to her mother on the phone because the defendant might hear. The victim testified that she did not want to lose her life. According to the victim, the house was small, and it was easy to hear what was going on in other rooms.

Describing the second incident on the following Saturday, the victim testified that she was awakened from sleep by the defendant shaking her fingers. The defendant stepped back into the doorway and motioned for the victim to come to him. When the victim said, "No," she testified the defendant pulled her out of bed and took her into the laundry room. According to the victim, A. was still sleeping. When asked why she did not "raise the alarm then," the victim responded: "I was scared. I didn't want to make any loud noises or do anything to, like, make him go through with killing the family. (Witness crying.)" According to the victim, the defendant was "forcefully pulling [her], because [she] was trying to pull the other way." The victim stated that she was not making any noise because she was scared. After the defendant pulled the victim into the

11

laundry room, he started taking her pants and panties off. The victim further described the incident as follows:

Q:   Okay. Did you say anything in regards to that?

A:   No, sir.

Q:   You didn't ask him to stop, you didn't ask him anything like that?

       . . . .

**BY MR. DOGA – CONTINUED:**

Q:   So, there was nothing else that you said at that point?

**BY THE WITNESS:**

A:   (Witness shakes head, indicating no.)

Q:   Can you recall saying anything?

A:   I did say, "Stop, Steven. This is not right. I'm a minor. Stop." And he just wouldn't stop. (Witness crying.)

Q:   Did he say, after you said that, did he say or do anything?

A:   He didn't stop.

Q:   And when you say "didn't stop", what do you mean by that?

A:   He didn't stop doing what he was doing. He had already took my pants and panties off, he had put me on top of the washer that was in there, and he said that, "I can lick your nipples." And I said, "No." And he then started to eating my p---y.

Q:   Did he say anything about that?

A:   He said, "You have a tight-a-s p---y." (Witness crying.)

Q:   And after he said that, what did he do?

A:   He took me off the washer and put me on the ground and started having sex with me.

Q:   I know this is a difficult question, but when he had you - - In what position were you on the washer?

12

A:	Laying.

Q:	Sitting up there?

A:	Yes, sir.

Q:	And when he talked about – his exact words were, "Eating your p---y"; is that what he said?

A:	Yes, sir.

Q:	And did he proceed to make any contact with your bottom down there with his mouth?

A:	Yes, sir.

Q:	That occurred?

A:	Yes, sir.

Q:	And then I believe you testified that he took you off the washer?

A:	Yes, sir.

Q:	And what did you say, he laid you down on the floor?

A:	Yes, sir.

Q:	And after he laid you down on the floor what, if anything, happened?

A:	He put his penis inside of me and starting having sex.

When asked to describe what she felt physically during the first event, the victim testified that it hurt "really, really bad" and was "burning like crazy." The victim recalled bleeding and experiencing burning, which worsened when she urinated. The feeling was even worse, the victim testified, during the second event:

Q:      It was worse?

A:      (Witness crying.)  Yes, sir.

Q:      Worse being, what; you had more pain?

A:      Yes, sir; more pain, more burning, more bleeding.

After the second event, the victim put her clothes back on and ran to A.'s room.  The victim did not try to wake A. because the defendant was still awake and she was scared.  Instead, the victim texted a friend in West Monroe.   When asked why she texted that friend, the victim stated that the friend could get in contact with the victim's mom and dad.  When asked why she decided to contact her friend after the second event as opposed to after the first event, the victim replied:

A:      Because it just hit me, how I could get in contact with my mom without anybody hearing me.  The first time I was in shock.  I wasn't thinking straight.  And the second time I happened to just look down at the dresser and my phone was sitting there, and I remember that she had my mom's number.

The next morning, the victim learned that her friend had contacted her mom and her mom had contacted A.'s mom, Jill.  Law enforcement was then contacted.  According to the victim, when the nurse examined her, she told D.C. that her injuries were the worst she had ever seen, that she was torn "really, really bad," and that she was bleeding a lot.  The nurse told the victim that if she did not get better, she needed to see a doctor about the possibility of surgery.  The victim was crying at the end of her direct testimony and identified the defendant as the person who raped her twice.  During cross-examination, the victim recalled that when Detective Gray questioned her about the incidents, he began by questioning her about the Saturday incident.  The victim remembered telling the detective that she asked the defendant for headache medicine and that the medicine knocked her out.

14

Defense counsel brought to the victim's attention the following statement given by her to the detective:

> Q: Okay. I'm going to read from this, your interview with the detective. "And, um, he took me to the laundry room and I was, like, what?, why are we in here?, what are we doing? And he just, like, started. He started taking off my clothes. I was, like, No, Steven, stop. Stop, Steven. I said, I just want to go to bed. This is wrong. I was, like, this isn't right. And then, um, then he kept doing it and I didn't know what to do. And he's a big man."
>
> So, is there any mention of force in that statement?
>
> **BY THE WITNESS:**
>
> A: No, sir, I did not mention force.
>
> Q: Okay. You talk about - - Then the detective asked you about a white pill that you took; this is the one that knocked you out?
>
> A: (Witness nods, indicating yes.)
>
> Q: So, your claim is that Mr. Blunt gave you some sort of narcotic drug or some prescription drug?
>
> A: Yes, sir.
>
> Q: Did there come a time that day on Sunday when your blood was taken?
>
> A: Yes, sir.

The victim acknowledged that the toxicology results were negative for drugs.

Defense counsel questioned the victim about what happened between Thursday and Saturday night, during which time the victim was allegedly afraid of the defendant. According to the victim, the defendant was cleaning the house Friday and Saturday. When asked if the defendant was at work on Friday, the victim said that he was not at work because he was at the house.

Defense counsel brought the victim's attention to a statement she gave Ms. Havlik and asked the victim to read it aloud:

A:    "He pushes me onto the bed and I said, "What are you doing?' He said, 'It will be okay.  We are just cuddling.'  And I was like, I want to be back with A. in her room.  Then he started rubbing on my back and squeezing on my thighs.  I got really uncomfortable, then tried to push him off of me.  That's when he held me down and started taking my clothes off.  Then he pulled his penis out and put it inside me and he said, "Damn, you got a tight p---y.'  Then he heard a noise and stopped and let me go."

Q:    I think your previous testimony was that you went to bed on Thursday night, the next thing you knew he was just on top of you.  But in this statement you say he's squeezing your thighs and rubbing your back, and after all that he took your clothes off.  Which way was it?

A:    Like, I was knocked out, and then it was so quick and stuff.  Like, after like a few days I started to remember stuff.  So, in the first few statements I didn't get it all out.

Q:    So, after a few days you remembered that?

A:    (Witness nods, indicating yes.)

Q:    Which – kind of like how long were these days that you remembered this part?

A:    It was like three (3) days when I was back at my house.  It wasn't long at all.

Q:    Okay.  You realize this statement was given Sunday?

A:    Yes, sir.

Q:    And so you remembered all this three (3) days later, but you were able to tell the nurse on Sunday?

A:    No.  I remembered a lot more three (3) days later, but after – that was, like, Sunday, almost – if it wasn't already night and I wasn't knocked out anymore.  When I say "knocked out", like, I don't remember anything until whatever it was starting coming off.  And then I remembered a lot more.  Like, in the detective's statement I didn't give much at all, like, detail.

Q:    But this statement and the detective's are on the same day?

16

A: That was later on in the day; yes.

Q: You realize that?

A: Yes.

Q: You do realize that?

A: Yes.

Q: But you testified just a half an hour ago that what you remembered was, "I was asleep in bed and the next thing I know Steven Blunt's on top of me."?

A: Yes.

Q: But you told the nurse something different, did you not?

A: I did. It's been two-and-a-half (2 -1/2), almost three (3) years.

Additionally, the victim testified that she could have walked outside of the house between the first incident and the second, but she did not. The victim also admitted that she could have called the police, but she was scared and in shock. The victim did not have an answer for why she did not continue shaking A. until she woke up. Finally, the victim acknowledged that she did go to the store with A. between the first and second incident unaccompanied by the defendant. On re-direct, the victim explained that she thought the headache pill may have caused her not to notice the defendant until he was on top of her during the first incident. The victim stated that she was scared and terrified when she gave her statements. After days had gone by, she remembered things that she had not said in her statements. The victim explained:

A: I felt like the pill wasn't what it was to be, so that's what made me forget, like, not know what was going on. And then after it wore off I started to remember and notice what went on, what happened.

Q: And during that time did your emotional state get better from the time that you gave the statements until the time you started remembering a couple, three (3) days later?

17

A:     My emotional state, like?

Q:     Yeah, the way you felt.  You testified earlier you were in shock, correct?

A:     Yes, sir.

Q:     You testified earlier you were scared?

A:     Yes, sir.

Q:     Okay.  My question is, were you less scared and in shock three (3) days later than you were at the time that you gave those statements?

A:     I mean, I was still scared, but I was able to talk more and say more because I didn't have - -

Finally, the victim testified that she did not consent to having sex with the defendant.

The final witness to testify was the defendant.  The defendant testified that his house in Rayne was approximately 800 square feet.  When asked why he told the detective that he did not remember if he had sex with the victim, the defendant replied that his memory was not clear because he drank a lot of Vodka and Red Bull with grenadine.  As for the victim's testimony that the defendant was home on Friday, the defendant stated that the victim was 100% incorrect and that he was at work that Friday.  The defendant admitted that he had sex with the victim twice. The defendant described the first event as follows:

A:     Thursday night, I remember going to the room and I invited her to come go with me.  And she got up and she came and went to the bedroom.  She followed me.  She was behind me following me into the bedroom.  When we got into the bedroom we talked for a little bit. Not much conversation.  It was basically about, you know, was we gonna have intercourse together.  And she said, yes.  And I took off my clothes and I got into bed.  And she then proceeded to take off her clothes and she got into the bed.  After she got into the bed we had a discussion about did she have any type of protection.  She said she

18

didn't need protection because she had birth control. And then we proceeded to have sexual intercourse.

The defendant testified that the noise was minimal and would not have been enough to wake his wife in the next room. According to the defendant, the victim never cried out or told him to stop. The defendant denied ever threatening to kill everyone in the house.

The defendant described the second sexual encounter as follows:

A:      The next evening we talked again, late that evening, about having sex again. She proceeded to follow me again to the utility room directly across from there, because Webb was in the bed sleeping this night, and so we proceeded in there. She took off her clothes and I took off my clothes and we had intercourse.

The defendant denied making any threats to harm the victim or his family.

The defendant admitted that it was wrong to have sex with the victim:

A:      At the time I was unsure about her age, but I knew it was wrong because I was married. I wasn't having - - I wasn't aware of her age. I thought she was nearer the age of seventeen (17) to eighteen (18).

On cross-examination, the defendant testified that he worked for the Ouachita Parish Sheriff's Office for seven to eight years. The defendant explained his reason for leaving the sheriff's office as follows:

A:      Because I had an extra-marital affair with a lady, and they said it was – how did he put it – conduct unbecoming of a deputy. Because they were investigating her and she had a history of drug use and she had got arrested. But I had nothing to do with the drug activity that she was participating in. They said that due to the fact that I was married, it didn't look – it wasn't right.

The defendant testified that at the time of the affair, he was not aware that the woman was a drug user.

The defendant described his current weight as approximately 210 to 220 pounds and his height as 5'11". According to the defendant, his stepdaughter, A., was sixteen going on seventeen at the time of the victim's visit. When asked why

he thought the victim may want to have sex with him, the defendant stated that the victim had been flirtatious earlier in the day. The defendant stated that he was forty-four years old at the time of the incident and forty-six years old at the time of trial.

The defendant testified that during the first act of sexual intercourse, he laid on top of the victim and the victim participated. The defendant described the victim's participation as putting her hand on his behind and moving underneath him. As for the second act of sexual intercourse, the defendant testified that the victim consented. The only noise the defendant heard the victim make was "pleasure moaning" both the first and second time.

When questioned about his statement to police that he did not remember if he had sex with the victim, the defendant explained:

A:     I answered it, because this is the truth and I know this is a critical answer. The reason why I gave the statement that I gave to them is because I was invoking my Fifth Amendment right, and I didn't want to make any untrue statements at the time by any events that had occurred.

Q:     Okay. I'm going to have to digest that for a second. You were a sheriff deputy for how many years?

A:     Seven (7) to eight (8) years.

Q:     Okay. And you're telling me when you gave that statement you invoked your Miranda rights?

A:     I invoked my Fifth Amendment right not to say much because I wanted to be accurate with the facts and I had been drinking all that night and I wasn't clearly – my thoughts were not clear.

Q:     Did you tell the detective, "I'm invoking my Fifth Amendment rights"?

A:     No, I didn't; I told him, "I don't remember." .

Q:     Don't remember. But in your mind you're invoking your Fifth Amendment rights?

20

A:    Correct.

The defendant continued to insist that he was not lying when he told the detective that he did not remember if he had sex with the victim:

A:    No, I was not lying. I said, "Nothing" to the point that I wasn't going to answer his question because I did not want to make any unclear or untrue statements.

Q:    Well, isn't saying "nothing occurred" an untrue statement?

A:    Nothing is nothing.

Q:    You were asked by the detective, "Okay, did you have any type of sexual activity with her at all?". And your answer was, "Not to my knowledge.". You don't consider that a lie?

A:    Not to my knowledge is not to my knowledge, at the time.

Q:    That's a big circular answer.

A:    Yes.

Q:    And your testimony is when you answered a question in that manner, that you were invoking your Fifth Amendment right to remain silent?

A:    Yes.

. . . .

Q:    I can't figure any other – and I don't know if the jury can figure it any other - - Let me back up. Sorry.

A:    Due to the fact that I had a large amount of alcohol prior to that I did not want to make any statements.

Q:    You had a large amount of alcohol before these events, but yet you remember it now with clarity. Now, at the time you gave this statement you were drunk?

A:    From a hangover.

Q:    Well, you were hungover?

A:    I believe so.

## Elements of Forcible Rape

The defendant was convicted of two counts of forcible rape. At the time of the offenses in question, forcible rape was defined, in pertinent part, as follows:

> A. Forcible rape is rape committed when the anal, oral, or vaginal sexual intercourse is deemed to be without the lawful consent of the victim because it is committed under any one or more of the following circumstances:

> (1) When the victim is prevented from resisting the act by force or threats of physical violence under circumstances where the victim reasonably believes that such resistance would not prevent the rape.

> (2) When the victim is incapable of resisting or of understanding the nature of the act by reason of stupor or abnormal condition of the mind produced by a narcotic or anesthetic agent or other controlled dangerous substance administered by the offender and without the knowledge of the victim.

La.R.S. 14:42.1.[3]

## Defendant's Argument

In brief, the defendant contends that his sex with the victim was clearly a crime, but it was not forcible rape. Appellate counsel notes that after having sex with the defendant the first time, the victim did not tell anyone what happened and went to sleep. The victim still did not tell anyone on Friday or Saturday and even left the house for a little while. After the second incident, the victim again went back to A.'s room and did not wake A. to tell her what happened. Appellate counsel notes that even though the victim claims the defendant held her down to have sex, the SANE nurse did not see any bruises or other injuries on the victim other than the injuries in the vaginal area. The victim also failed to tell the detectives that force was used. Appellate counsel contends that the testimonies of the SANE nurse and the DNA analyst were inconclusive as to whether the sex was

---

[3]As previously noted, "forcible rape" was renamed "second degree rape" by 2015 La. Acts No. 184, §1.

22

consensual. Nurse Havlik, appellate counsel claims, testified on cross-examination that she could not say whether the sex was consensual or nonconsensual. Appellate counsel also notes that even though Ms. Havlik described the victim's vaginal injuries as some of the worst she had ever seen, Ms. Havlik had only seen about fifty patients before seeing the victim and had only seen about twice that many patients by the time of trial. "Further," appellate counsel contends, "it is probable to assume that a 15-year-old virgin having sex for the first time with a big, grown man would likely experience 'trauma.'"

As for the victim's claim that the defendant threatened to kill everyone in the house if she said anything, appellate counsel contends this claim is illogical since the other people in the house were the defendant's family. Thus, it was not reasonable for the victim to believe that the defendant would carry out such threats. Appellate counsel further asserts that the victim's failure to alert anyone of the incident the day after the incident, especially when she left the house to get shaved ice, was not reasonable if she had, in fact, been forcibly raped by the defendant.

Appellate counsel also contends that the state failed to prove that the victim was incapable of resisting because of a narcotic stupor. The defendant notes that neither the victim nor any other witness testified as to the type of medicine the defendant gave the victim for her headache. Additionally, the victim did not testify that the medicine made her dizzy, nauseated, or caused her to pass out. Appellate counsel argues that the victim's testimony that she told the defendant to "stop" and "to get off of her" shows that the victim knew what was happening to her. Additionally, appellate counsel points out that the results of the victim's blood screen was negative for any drugs.

23

In conclusion, appellate counsel argues that the state failed to prove that the victim did not consent to having sexual intercourse with the defendant on both occasions. Alternatively, even if this court finds the jury reasonably found the victim did not consent, appellate counsel argues that the state still failed to prove that the defendant used force to make the victim have sex with him. Thus, appellate counsel claims the jury should have found the defendant guilty of a lesser and included offense.

*State's Argument*

In response to appellate counsel's argument, the state asserts that the jury's decision was supported by the victim's testimony as well as the "compelling objective and scientific testimony of Nurse Havlik."

*Jurisprudence*

Recently, this court stated the following regarding the proof necessary to sustain a conviction for forcible rape:

> To sustain a conviction for forcible rape, actual resistance is not required. Rather, all that is necessary is that the victim be *prevented from* resisting by force or threats of physical harm to such an extent that she *reasonably believed* resistance to be futile. Only a subjective, reasonable belief is necessary.

*State v. Carter*, 14-926, p. 12 (La.App. 3 Cir. 4/1/15), 160 So.3d 647, 654, *writ denied*, 15-859 (La. 6/17/16), 192 So.3d 770 (citations omitted). The court compared the facts before it with other cases of forcible rape:

> In [*State v.*] *Powell*, 438 So.2d 1306 [(La.App. 3 Cir.), *writ denied*, 443 So.2d 585 (La.1983)], a minor victim asked the defendant for a ride and he agreed to take her to a cousin's house. Instead, he brought her to a secluded area. The victim testified that the defendant slapped her, threatened to kill her, and indicated a weapon was under the seat of the vehicle. She removed her own pants, and he had sexual intercourse with her. A panel of this court concluded there was no evidence of resistance and little evidence that she believed resistance to be futile.

In *State v. Wilkinson*, 00-339, p. 15 (La.App. 5 Cir. 10/18/00), 772 So.2d 758, 766, *writ denied*, 00-3161 (La. 10/12/01), 799 So.2d 494, the fifth circuit explained that evidence presented by the state was sufficient to convict the defendant of forcible rape where the defendant:

> forcibly grabbed [the victim], threw her to the ground, pushed down her clothing, laid on top of her and penetrated her vaginally several times. [The victim], a fourteen-year-old, was frightened, weighed down by the backpack and did not know whether any action on her part would have caused him to do additional harm. She was thrown into a secluded area and could have reasonably believed that screaming would be futile.

In *Wilkinson*, the defendant did not threaten the victim and did not have a weapon.

Our own circuit has upheld a conviction for forcible rape under similar circumstances. In *State v. Schexnaider*, 03-144, p. 4 (La.App. 3 Cir. 6/4/03), 852 So.2d 450, 454, the minor victim testified that she and the defendant were sitting on the tailgate of the defendant's truck when he "grabbed her face, kissed her and pushed her onto her back in the bed of his pick-up truck." The defendant then "g[o]t on top of her", took off her pants, and penetrated her. *Id.* She testified that the defendant did not slap her and she did not resist, but that "when she get[s] frightened, she freezes." *Id.* Eventually, "she was finally able to tell the defendant 'No,'" and that she was going to tell someone, and the defendant stopped. *Id.* Again, there was no indication that the defendant threatened the victim or had a weapon. A panel of this court upheld the conviction for forcible rape and specifically endorsed the dissent in *Powell*.

*Id.* at 654-55 (first and second alteration ours).

After discussing the above cases, this court examined the facts before it to determine whether Carter's actions amounted to forcible rape of B.P. The court noted the pattern of Carter's sexual misconduct toward B.P. In one incident, Carter woke B.P. by shaking her, puttting his hands over her mouth, lifting up her dress, and putting his penis between her legs. *Id.* This court also noted that B.P. stated she was uncomfortable with the sexual conduct and would always try to make Carter stop. *Id.* Another incident noted by this court was an incident that

occurred when B.P. was seven years old. Carter woke B.P., carried her to the bathroom, jumped on top of her and penetrated her. *Id.* Finally, this court described the incident for which Carter was actually convicted:

> Finally, B.P. described the details of the incident in the back of her father's truck. She had been watching television when Defendant came to her house. He asked for a watermelon out of B.P.'s father's truck. She testified that Defendant came to the truck shortly after her and that, while she was in the bed of the truck, Defendant "made [her] lay down, and . . . had sex with [her]." She further testified that:
>
> A. He picked up my dress, just pushed my panties over to the side. He didn't pull it down. He didn't take my clothes off.
>
> . . . .
>
> In her testimony, [B.P.] further indicated that, although the [sic] she was able to "just jump[] up" after Defendant penetrated her vaginally, she was scared, hysterical, and "didn't know [what] was going to happen."
>
> The parallels between *Wilkinson*, *Schexnaider*, and the instant matter are striking and support a finding of forcible rape. In *Schexnaider*, 852 So.2d at 454, 457, the defendant "pushed her onto her back in the bed of his pick-up truck" and "got on top of her." In *Wilkinson*, 772 So.2d at 766, the defendant "pushed down [the victim's] clothing [and] laid on top of her" after he grabbed her and threw her to the ground. In the instant matter, although the victim testified that Defendant "said, lay down," she also testified "[she] didn't know [intercourse] was going to happen[]" and that Defendant "made" her lie down in the bed of the truck. Then, he pushed her panties to the side; she did not willingly remove them. Then, he "got on top of [her]" and had sex with her. Additionally, B.P. indicated she was scared, confused, and upset. She "jumped up" when it began to hurt. In slightly different words, the victims in *Schexnaider*, *Wilkinson*, and the instant matter said the same thing; an adult man made them get on their back, got on top of them, and penetrated them vaginally. Although B.P. did not explicitly say that she did not resist because she believed that resistance would be futile, it is clear from B.P's testimony that when Defendant "made [her] lay down," "pushed" her panties to the side, and "got on top of [her,]" she believed it pointless to resist. Consideration of the victim's age and size supports this conclusion. B.P. was a young girl of barely twelve years old; Defendant was an adult man. Although B.P. did not directly testify to the size difference between the two, she explained that, at one point, Defendant was large enough to physically pick her

26

up and carry her to his bathroom, where he got on top of her and had sex with her. The conclusion that B.P. thought it futile to resist is further buttressed by the history of Defendant having taken advantage of her on numerous prior occasions and her having been helpless to dissuade him on any of the prior occasions. . . . A jury could reasonably have concluded that the victim reasonably believed that, against the force Defendant exerted with his body as he "got on top" of B.P., resistance was useless, especially in light of her age, her size, and the extensive history between the two.

*Id.* at 656-67(third, fourth, fifteenth alteration ours).

Although there was no history of abuse between the present victim and the defendant as there was in *Carter*, the evidence of force is even stronger in the present case and is similar to the force used in *Schexnaider* and *Wilkinson*. The present victim testified that when the first sexual assault occurred, she woke up to the defendant, a "heavy mass," on top of her. When the victim told the defendant to get off, the defendant told her he would kill everyone in the house if she told anyone. The victim testified that she was terrified but was too scared to scream. The victim was fearful of the defendant because of his threat, because he was big, and because he was an ex-cop. The victim testified that she was fearful because she believed the defendant had the ability to carry out his threat. The victim testified that she was scared and did not know what to do because she did not know what would happen. Additionally, the victim testified that she did not want to lose her life.

Prior to the second sexual assault, the defendant pulled the victim out of the bed and took her into the laundry room. The victim described the pulling as forceful because she was trying to pull away. The victim was scared to make any loud noises because she was afraid the defendant would go through with his threat to kill all of the family. The defendant took the victim's pants and panties off.

27

Defendant did not stop when the victim asked him to. The victim specifically denied that the sex was consensual. As for both sexual acts, the victim described the intercourse as extremely painful.

The use of force was supported by the physical findings of Ms. Havlik, the SANE nurse that examined the victim. Even though Ms. Havlik, like Detective Gray, did not see any marks or bruises on the victim that would indicate the defendant held her down, Ms. Havlik noticed other evidence of force. Ms. Havlik saw a hematoma in the victim's vaginal area, swelling in the victim's hymenal tissue, and a very large laceration – injuries, Ms. Havlik opined, that were indicative of blunt force trauma to the victim's vaginal area, that were consistent with an assault, and that were not usually sustained in "everyday sex." The laceration in the victim's vaginal area, Ms. Havlik stated, was one of the worst she had seen in five years. According to Ms. Havlik, this injury is not likely to occur when both individuals are participating in the intercourse. The victim's allegations of force, Ms. Havlik explained, were consistent with the injuries found.

Considering the above, we find the evidence was sufficient to prove that the victim was prevented from resisting the rapes by the defendant's force or threats of physical violence under circumstances where the victim reasonably believed that her resistance would not prevent the rapes. Thus, the evidence was sufficient to convict the defendant of section one of the forcible rape statute, La.R.S. 14:42.1(A)(1).

## ASSIGNMENT OF ERROR NUMBER TWO

In this assignment of error, appellate counsel asserts that the trial court abused its sentencing discretion by sentencing the defendant to consecutive sentences for what was alleged to be one continuous act. At the time of the

28

offenses, July 2013, the crime of forcible rape was punishable by imprisonment at hard labor for not less than five nor more than forty years, at least two years of which must be served without benefit of probation, parole, or suspension of sentence. La.R.S. 14:42.1(B). The trial court imposed a sentence of thirty years at hard labor on each count. At the sentencing hearing, the trial court stated the following:

**BY THE COURT:**

Okay. According to La.R.S. 14:42.1, forcible rape, "B" says, "Whoever commits the crime of forcible rape shall be imprisoned at hard labor for not less than five (5) years nor more than forty (40) years. At least two (2) years of the sentence imposed shall be without benefit of parole, probation or suspension of sentence."

In this particular case, after reviewing the aggravating and mitigating circumstances, I believe there is a risk that he would commit another crime such as this since the victim's age was so young. Any light sentence would take away from the serious nature of this offense. The offender's conduct, I believe to be a deliberate cruelty to the victim, especially saying that she consented to this. The offender knew the victim's age, and knew, even though he says he didn't know exactly her age, he knew she was young, and that she was particularly vulnerable to these kind of crimes and not able to defend herself. And he used his status as being someone in the household who had control over the household at the time in order to do this. And he also used threats of actual violence in the commission of the offense.

So, the only mitigating factor I see is the fact that you hadn't been convicted of a crime before.

So, with that being said, I'm going to sentence you to thirty (30) years, hard labor on each count, to run consecutive. And I will do thirty (30) years without benefit of parole, probation or suspension of sentence.

Although defense counsel did not object when the sentences were imposed, the defendant filed a Motion to Reconsider Sentence alleging the following:

NOW INTO COURT, through undersigned counsel, comes the defendant, STEVEN L. BLUNT, who with respect moves this Honorable Court to reconsider his sentence pursuant to Louisiana

29

Code of Criminal Procedure Article 881.1 on the basis that the sentence imposed upon his [sic] is excessive.

The trial court denied the motion to reconsider the sentence without a hearing.

On appeal, the defendant argues that the trial court erred in denying his motion to reconsider sentence for the following reasons:

> In this case, the two alleged incidents took place in what the prosecutor and D.C. each considered one long continuous scheme. It took place over an extended weekend while D.C. was staying at Steven's house. Steven did not have a criminal record, which even the trial court recognized was a mitigating factor. (R. at 414). "Consecutive sentences for convictions stemming from a common scheme or plan require particular justification." *State v. H.B.*, 06-1436 (La.App. 3 Cir. 04/04/07); 955 So.2d 255, 260 (quoting *State v. Thibodeaux*, 04-1166, p. 5 (La.App. 1 Cir. 4/20/05); 915 So.2d 807, 810). Although the sentencing court has great discretion in determining an appropriate sentence, that discretion was abused here. Steven's sentences should have been concurrent to each other. La.C.Cr.P. art. 883.

The state counters appellate counsel's argument by arguing that the trial court supported the sentences with the factors listed in La.Code Crim.P. art. 894.1 and by arguing that the sentences are not grossly disproportionate to the crimes charged.

The only argument raised by the defendant on appeal regarding the excessiveness of his sentences is that the trial court erred in ordering the sentences to be served consecutively. Because the defendant's claim that the trial court erred in imposing consecutive sentences was not set forth in the motion to reconsider sentence, this court finds that consideration is barred pursuant to La.Code Crim.P. art. 881.1(E), which states:

> Failure to make or file a motion to reconsider sentence or to include a specific ground upon which a motion to reconsider sentence may be based, including a claim of excessiveness, shall preclude the

30

state or the defendant from raising an objection to the sentence or from urging any ground not raised in the motion on appeal or review.

*See also State v. Prejean*, 10-480 (La.App. 3 Cir. 11/3/10), 50 So.3d 249.

In *State v. Wilmot*, 13-994 (La.App. 5 Cir. 5/14/14), 142 So.3d 141, the fifth circuit declined to address the consecutiveness of the sentences since the issue was not raised in the trial court. The court noted that "when the consecutive nature of sentences is not specifically raised in the trial court, the issue is not included in the bare constitutional excessiveness review." *Wilmot*, 142 So.3d at 148 n.6 (citing *State v. Escobar-Rivera*, 11-496 (La.App. 5 Cir. 1/24/12), 90 So.3d 1, *writ denied*, 12-409 (La. 5/25/12), 90 So.3d 411). *See also State v. Christoff*, 00-1823 (La.App. 5 Cir. 5/30/01), 788 So.2d 660.

Despite La.Code Crim.P. art. 881.1(E), this court has chosen to review sentencing claims when no motion to reconsider was filed or no ground specified in the motion as a bare claim of excessiveness. *See State v. Johnlouis*, 09-235 (La.App. 3 Cir. 11/4/09), 22 So.3d 1150, *writ denied*, 10-97 (La. 6/25/10), 38 So.3d 336, *cert. denied*, 562 U.S. 1150, 131 S.Ct. 932 (2011); *State v. Thomas*, 08-1358 (La.App. 3 Cir. 5/6/09), 18 So.3d 127; *State v. Perry*, 08-1304 (La.App. 3 Cir. 5/6/09), 9 So.3d 342, *writ denied*, 09-1955 (La. 6/25/10), 38 So.3d 352; *State v. H.J.L.*, 08-823 (La.App. 3 Cir. 12/10/08), 999 So.2d 338, *writ denied*, 09-606 (La. 12/18/09), 23 So.3d 936; *State v. Quinn*, 09-1382 (La.App. 3 Cir. 5/12/10), 38 So.3d 1102, *writ denied*, 10-1355 (La. 1/7/11), 52 So.3d 885.

This court discussed the standard of review applicable to claims of excessiveness in *State v. Whatley*, 03-1275, pp. 5-6 (La.App. 3 Cir. 3/3/04), 867 So.2d 955, 958, as follows:

> The Eighth Amendment to the United States Constitution and La. Const. art. I, § 20 prohibit the imposition of cruel or excessive

punishment. " '[T]he excessiveness of a sentence becomes a question of law reviewable under the appellate jurisdiction of this court.' " *State v. Dorthey*, 623 So.2d 1276, 1280 (La.1993) (quoting *State v. Sepulvado*, 367 So.2d 762, 764 (La.1979)). Still, the trial court is given wide discretion in imposing a sentence, and, absent a manifest abuse of that discretion, we will not deem as excessive a sentence imposed within statutory limits. *State v. Pyke*, 95-919 (La.App. 3 Cir. 3/6/96), 670 So.2d 713. However, "[m]aximum sentences are reserved for the most serious violations and the worst offenders." *State v. Farhood*, 02-490, p. 11 (La.App. 5 Cir. 3/25/03), 844 So.2d 217, 225. The only relevant question for us to consider on review is not whether another sentence would be more appropriate, but whether the trial court abused its broad discretion in sentencing a defendant. *State v. Cook*, 95-2784 (La.5/31/96), 674 So.2d 957, *cert. denied*, 519 U.S. 1043, 117 S.Ct. 615, 136 L.Ed.2d 539 (1996).

Even when a sentence falls within the statutory sentencing range, it still may be unconstitutionally excessive. In determining whether a sentence shocks the sense of justice or makes no meaningful contribution to acceptable penal goals, this court has suggested that several factors may be considered:

> While a comparison of sentences imposed for similar crimes may provide some insight, "it is well settled that sentences must be individualized to the particular offender and to the particular offense committed." *State v. Batiste*, 594 So.2d 1 (La.App. 1 Cir.1991). Additionally, it is within the purview of the trial court to particularize the sentence because the trial judge "remains in the best position to assess the aggravating and mitigating circumstances presented by each case." *State v. Cook*, 95-2784 (La.5/31/96); 674 So.2d 957, 958.

*State v. Smith*, 02-719, p. 4 (La.App. 3 Cir. 2/12/03), 846 So.2d 786, 789, *writ denied*, 03-562 (La. 5/30/03), 845 So.2d 1061.

Although the defendant's claims regarding the consecutive nature of his sentences were not raised in the trial court and not preserved for review, a general review of the consecutiveness is necessary in evaluating the excessiveness of the sentences. No other argument as to the excessiveness of the sentences was raised by the defendant on appeal. Louisiana Code of Criminal Procedure Article 883, in pertinent part, provides:

32

If the defendant is convicted of two or more offenses based on the same act or transaction, or constituting parts of a common scheme or plan, the terms of imprisonment shall be served concurrently unless the court expressly directs that some or all be served consecutively. Other sentences of imprisonment shall be served consecutively unless the court expressly directs that some or all of them be served concurrently.

This court addressed the appropriateness of consecutive sentences in *State v. Ste. Marie*, 97-168 (La.App. 3 Cir. 4/18/01), 801 So.2d 424. Ste. Marie, a first-time-felony offender, was convicted of four counts of indecent behavior with juveniles, each count involving a different victim. The trial court noted that the offenses occurred over a period of time, that Ste. Marie had established a long relationship with the victims, and that Ste. Marie had much contact with the victims. *Id.* This court found the trial court erred in ordering Ste. Marie's sentences to run consecutively:

The Defendant's Pre Sentence Investigation (PSI) indicates that he has no criminal record. The Defendant has been married for twenty-seven (27) years had has three (3) children. He was employed for twenty (20) years as the Senior Human Resource Administrator for J. Ray McDermott.

We conclude that the Defendant's sentences are excessive based upon the fact that he is a first-time felony offender, and a substantial body of case law indicates he should have been sentenced concurrently rather than consecutively.

*Id.* at 436.

In *State v. Urena*, 13-1286, p. 25 (La.App. 3 Cir. 5/7/14), 161 So.3d 701, 717, *writ denied*, 14-1603 (La. 4/10/15), 164 So.3d 829, this court apparently found the sexual offenses committed by Urena against his stepdaughter constituted a common scheme or plan since it remanded the case for the trial court to determine "whether there [was] sufficient justification for imposing the sentences to be served consecutively." Urena's convictions involved the sexual abuse of his

33

five-year-old stepdaughter over a six-year period from 1998 through 2004. When the case was remanded, the trial court reduced the number of years to be served but still ordered the sentences to run consecutively. *State v. Urena*, 15-1065 (La.App. 3 Cir. 4/6/16), ___ So.3d ___. On appeal after the remand, this court found the trial court's justification was sufficient:

> Considering the trial court's articulation of the vulnerability of the victim due to her youth, since she was five when the abuse started, and the fact the abuse continued until she was twelve years old, which added to the inevitable psychological harm inflicted by her stepfather, we find these factors were "atypical" and, as such, were justification for imposing the two ten-year sentences, for a total of twenty years imprisonment. Accordingly, we affirm the sentences as imposed by the trial court.

*Id.* at _____.

In *State v. Touchet*, 06-281 (La.App. 3 Cir. 5/31/06), 931 So.2d 1264, this court found that Touchet's daily abuse of the same victim over a period of several weeks did not constitute a common scheme. Additionally, in *State v. Ester*, 490 So.2d 579, 587 (La.App. 2 Cir. 1986), the second circuit found that Ester's four counts of indecent behavior with a juvenile (her son) "were separate and distinct enough to justify consecutive sentences" even if they could be deemed as part of the same overall scheme. The offenses occurred on October 29, 1981; November 3, 1981; November 5, 1981; and December 10, 1981. *Id.*[4]

Although the trial court in the present case did not specifically state its reasons for imposing consecutive sentences, the record as a whole can be considered in determining whether consecutive sentences were justified. *See McKeel*, 13-855 (La.App. 3 Cir. 2/12/14), 153 So.2d 1029. As noted by the trial

---

[4]This court has found that offenses did not constitute the same act or transaction when they involved different victims. *State v. Davis*, 06-922 (La.App. 3 Cir. 12/29/06), 947 So.2d 201; *State v. Massey*, 08-839 (La.App. 3 Cir. 12/10/08), 999 So.2d 343 (this court found no common scheme when offenses were committed against two separate victims at two separate events, even though they both took place during the same weekend camping trip.)

court, the defendant was a first-time felony offender. "[I]n cases involving offenders without prior felony record [sic], concurrent rather than consecutive sentences should be imposed, particularly where the convictions arise out of the same course of conduct." *State v. Brown*, 627 So.2d 192, 199-200 (La.App. 3 Cir. 1993), *writ denied*, 93-3101 (La. 3/18/94), 634 So.2d 850 (citing *State v. Jacobs*, 383 So.2d 342 (La.1980), and *State v. Cox*, 369 So.2d 118 (La.1979)). As also noted by the trial court, however, the defendant tried to cast blame on the victim by stating that she consented to the acts. The trial court also noted the danger the defendant presents to society because of the threats he used and the victim's young age. Additionally, the injuries suffered by the victim were the worst the SANE nurse had ever seen. Finally, we note that the defendant was a former police officer, a fact that caused the victim great fear, and a fact that makes his conduct even more reprehensible. For these reasons and because the defendant is restricted to a bare bones excessiveness review on appeal, this court finds the record supports the trial court's imposition of consecutive sentences. The defendant's sentences are well within the sentencing range and we note the supreme court's repeated admonition "that sentence review under the Louisiana constitution does not provide an appellate court with a vehicle for substituting its judgment for that of a trial judge as to what punishment is more appropriate in a given case." *State v. Savoy*, 11-1174, p. 5 (La. 7/2/12), 93 So.3d 1279, 1283 (citing *State v. Walker*, 00-3200 (La. 10/12/01), 799 So.2d 461; *State v. Cook*, 95-2784 (La. 5/31/96), 674 So.2d 957, *cert. denied*, 519 U.S. 1043, 117 S.Ct. 615 (1996); and *State v. Humphrey*, 445 So.2d 1155 (La.1984)).

## CONCLUSION

The defendant's conviction is affirmed. We find no error in the trial court's imposition of consecutive sentences. Accordingly, the defendant's sentences are affirmed.

**AFFIRMED.**