STATE OF LOUISIANA
COURT OF APPEAL, THIRD CIRCUIT

17-19

STATE OF LOUISIANA

VERSUS

DARRIN KASHY DUHON
AKA DARRIN DUHON

**********

APPEAL FROM THE
SIXTEENTH JUDICIAL DISTRICT COURT
PARISH OF ST. MARTIN, NO. 12-243406
HONORABLE CURTIS SIGUR, DISTRICT JUDGE

**********

VAN H. KYZAR
JUDGE

**********

Court composed of Sylvia R. Cooks, Billy Howard Ezell, and Van H. Kyzar,
Judges.

AFFIRMED.

Chad M. Ikerd
Louisiana Appellate Project
P.O. Box 2125
Lafayette, LA 70502
(225) 806-2930
COUNSEL FOR DEFENDANT/APPELLANT:
    Darrin Duhon

Jeff Landry
Attorney General
Marty L. White
Andrea Barient
Assistant Attorneys General
Louisiana Department of Justice
P. O. Box 94005
Baton Rouge, LA 70804-9005
(225) 326-6200
COUNSEL FOR APPELLEE:
    State of Louisiana

**KYZAR, Judge.**

The defendant, Darrin Kash Duhon,[1] pled guilty to one count of manslaughter, a violation of La.R.S. 14:31, and two counts of attempted manslaughter, violations of La.R.S. 14:27 and La.R.S. 14:31. He was sentenced by the trial court to forty years at hard labor on the manslaughter conviction and eight years at hard labor on each count of attempted manslaughter, with the two eight year sentences to run concurrently with each other, but consecutively to the forty-year sentence. The defendant appeals his sentences. For the following reasons, we affirm.

## DISCUSSION OF THE RECORD

The facts presented at the guilty plea proceeding reveal that the defendant and his wife lived in Breaux Bridge, Louisiana, next door to his wife's grandmother, Mildred Hebert, and her aunt and uncle, Emmaline and Charlie Thibodeaux. On the morning of September 1, 2012, Mrs. Hebert and Mrs. Thibodeaux were in the kitchen while Mr. Thibodeaux was working in the yard. The defendant entered the home, retrieved a 9mm handgun from a closet, shot Mrs. Hebert twice, and shot Mrs. Thibodeaux multiple times. As Mr. Thibodeaux entered the home, the defendant also shot him. After shooting his victims, the defendant called 911 and then returned to his home and collected his nine-year-old son, who he drove to his brother's job site and dropped off.

Thereafter, the defendant drove onto I-10 from the Breaux Bridge exit and began following a vehicle driven by Allison Spikes until she exited onto Ambassador Caffery Parkway in Lafayette. When Ms. Spikes pulled into the parking lot of the Ambassador Caffery Inn, the defendant parked next to her and

---

[1] The defendant was identified as Darrin Kashy Duhon in the November 2, 2012 Bill of Information, charging him with three counts of attempted first degree murder, and the February 1, 2013 Bill of Indictment, charging him with first degree murder. In various court documents, the defendant was also identified as Darrin Duhon, Darrin K. Duhon, and Darrin Kash Duhon. Based on a September 17, 2013 Motion for Bond Reduction, which was filed by the defendant in proper person, we will identify the defendant as Darrin Kash Duhon.

attempted to carjack her car. He fled the scene when Ms. Spikes locked her door and contacted the Lafayette Police Department on her cell phone. He was later apprehended by the Abbeville Police Department following a high-speed chase, after which he was turned over to the St. Martin Parish Sheriff's Office.

The defendant was originally charged by bill of information with three counts of attempted first degree murder. Upon the death of one of the victims, the state dismissed one of the attempted first degree murder charges, and a grand jury indicted the defendant on one count of first degree murder. Both charging instruments were filed under the same docket number. The defendant initially entered a plea of not guilty and not guilty by reason of insanity to the three counts of attempted first degree murder and filed a motion to form a sanity commission to determine his sanity both at the present and at the time of the offenses. However, after the grand jury indictment on the charge of first degree murder, the defendant withdrew his motion for a sanity commission. The defendant entered a plea of not guilty to the charge of first degree murder, but later changed his plea to not guilty and not guilty by reason of insanity. Thereafter, a joint motion for a sanity commission was filed by the state and the defendant. The defendant later entered a guilty plea to one count of manslaughter and two counts of attempted manslaughter pursuant to a plea agreement and was sentenced as stated.

## ERRORS PATENT

In accordance with La.Code Crim.P. art. 920, all appeals are reviewed for errors patent on the face of the record. After reviewing the record, we find there is one error patent concerning the withdrawal of the request for the appointment of a sanity commission.

Louisiana Code of Criminal Procedure Article 642 states:

The defendant's mental incapacity to proceed may be raised at any time by the defense, the district attorney, or the court. When the question of the defendant's mental incapacity to proceed is raised, there shall be no further steps in the criminal prosecution, except the institution of prosecution, until the defendant is found to have the mental capacity to proceed.

On January 22, 2013, defense counsel filed a pleading entitled "Motion to Form Sanity Commission" in which he requested the appointment of a sanity commission to examine the mental condition of the defendant both at the present time as well as at the time of the offenses. The motion indicated that the request was based on a defense investigator's observation that the defendant showed characteristics of having a mental disorder. The trial court set the matter for hearing on February 7, 2013. The court minutes and the transcript from that day indicate that defense counsel withdrew the motion prior to the trial court's ruling thereon and that the defendant was not present in court for the hearing. In requesting to withdraw the motion, defense counsel stated:

> Your Honor, the Public Defender's Office represents Mr. Duhon. It is set today for a Motion for Your Honor, that motion was filed a while back when Mr. Duhon was originally arrested for three (3) counts of attempted murder. One of the alleged victims subsequently died and he got indicted this past week for first degree murder. So in light of that, we are going to withdraw the motion at this time because it is a whole new ball game with the new charge. I believe that matter is going to be set for an arraignment later this month and we will determine if and when we will re-file the Sanity Commission at that time.

The appointment of a sanity commission is only required when the trial court finds that there are reasonable grounds to doubt the mental capacity of a defendant to proceed to trial. La.Code Crim.P. art. 643. In *State v. Normand*, 04-840, pp. 3-4 (La.App. 3 Cir. 12/15/04), 896 So.2d 98, 100, *writ denied*, 05-231 (La. 5/6/05), 901 So.2d 1094, this court stated as follows:

> The appointment of a sanity commission "is not a perfunctory matter or a ministerial duty of the trial court nor is it guaranteed to every accused in every case." *State v. Nix*, 327 So.2d 301, 323

3

(La.1975); *State v. Sepulvado*, 93–2692 (La.4/8/96), 672 So.2d 158. The burden of proof lies with the defendant. The defendant must show "by a clear preponderance of the evidence reasonable grounds for the trial judge to believe he is mentally deficient." *State v. Cyriak*, 96–661, p. 8 (La.App. 3 Cir. 11/6/96), 684 So.2d 42, 47. Moreover, "[t]he fact that the defendant's capacity to proceed is called into question does not, for that reason alone, require the trial court to order a mental examination of the defendant." **4 *State v. Lott*, 574 So.2d 417, 424 La.App. 2 Cir.), *writ denied*, 580 So.2d 666 (La.1991), *affirmed after remand*, 27,849 (La.App. 2 Cir. 4/3/96), 671 So.2d 1182. The trial court has great discretion in ruling on a determination of competency, and its decision will not be overturned on appeal absent an abuse of discretion. *State v. Comeaux*, 514 So.2d 84 (La.1987); *State v. Lowenfield*, 495 So.2d 1245 (La.1985).

We find that the trial court erred in failing to specifically rule on the defendant's January 22, 2013 motion to appoint a sanity commission contesting the defendant's capacity to proceed before allowing counsel to withdraw the motion.

In *State v. Tyler*, 11-1123 (La.App. 3 Cir. 5/9/12), 89 So.3d 510, *writ denied*, 12-1314 (La. 11/30/12), 103 So.3d 364, the defendant claimed on appeal that the trial court erred in allowing defense counsel to withdraw a motion to appoint a sanity commission as it was a prohibited step in furtherance of the prosecution. The trial court had signed an order appointing a sanity commission, but the defendant had not yet been examined. Although the contradictory hearing on the motion was scheduled, the motion to request a sanity commission was withdrawn by defense counsel. This court found merit to the defendant's claim, stating:

> Louisiana Code of Criminal Procedure Article 643 requires the trial court order a mental examination of Defendant when it has reasonable ground to doubt Defendant's mental capacity to proceed. Louisiana Code of Criminal Procedure Article 644 requires the court appoint a sanity commission to examine and report on the mental condition of Defendant within seven days after a mental examination is ordered. The examination was ordered in the present case, indicating the trial court found reasonable ground to doubt Defendant's capacity to proceed. *See State v. Strain*, 42,809 (La.App. 2 Cir. 12/5/07), 972 So.2d 1184, and *State v. Nomey*, 613 So.2d 157 (La. 1993). Withdrawal of a motion to appoint a sanity commission has been found to be a further step in the prosecution which improperly removes the ultimate decision of competency from the trial court. *State v. Carney*, 25,518 (La.App. 2 Cir. 10/13/95), 663

4

So.2d 470, *Strain*, 972 So.2d 1184, *State v. Darnell*, 43,048 (La.App. 2 Cir. 8/13/08), 988 So.2d 870. Thus, we find allowing the case to move forward in the absence of a determination that Defendant had the capacity to proceed was legal error.

*Id.* at 513-14.

Unlike the facts in *Tyler*, the trial court here had not yet appointed a sanity commission, and thus had not yet ruled on whether the defendant had presented reasonable grounds to doubt his mental capacity to proceed. It is further noted that the basis for the initial motion for a sanity commission was a broad, non-specific assertion that the defendant showed "characteristics of having a mental disorder[,]" which were observed by defense counsel's investigator. Accordingly, the question becomes whether the trial court should have determined whether the defendant was competent to proceed or whether his request for the sanity commission was without merit, rather than simply permitting defense counsel to withdraw the motion outside of the presence of the defendant.

In *State v. Carney*, 25,518, pp. 4-5 (La.App. 2 Cir. 10/13/95), 663 So.2d 470, the court, in addressing the trial court's role relative to issues of a defendant's capacity to proceed, stated the following:

> "Due process and our statutory law require that the issue of the defendant's mental capacity to proceed shall be determined by the court." [*State v.*] *Rogers*, [419 So.2d 840, 843 (La. 1982)]. "This cardinal principle . . . prohibits [the court] from committing the ultimate decision of competency to a physician or anyone else." *Id.* Furthermore, the above articles, when read in pari materia, implicitly require the trial court to rule on the defendant's motion and determine whether a "reasonable ground to doubt the defendant's mental capacity" exists before proceeding further in the prosecution. Withdrawing a motion to appoint a sanity commission is a further step in the prosecution. Also, permitting such a motion to be withdrawn takes the ultimate decision of competency away from the court. Thus, although a mental examination may not be required in every case where the issue of mental capacity is raised, *State v. Wilkerson*, 403 So.2d 652 (La. 1981); *State v. Folse*, 623 So.2d 59 (La.App. 1st Cir. 1993), the record must reflect that the trial court made a determination of whether or not reasonable grounds exist to doubt the defendant's capacity to proceed.

After finding that the defendant had sufficiently raised the issue of his capacity to proceed following his indictment, the court, in reversing the defendant's conviction, stated as follows:

> After the defendant raised the issue, the trial court allowed further steps in the prosecution to occur without making a determination of the defendant's mental capacity to proceed to trial. When defense counsel withdrew the motion to appoint a sanity commission, the defendant was not present and the trial court did not observe or question him about his mental capacity. At the very least, the record should reflect that the trial court should have personally observed the defendant and questioned him as to his understanding of the proceedings to determine if a "reasonable ground" existed to doubt his mental capacity. Further, as noted by the United States Supreme Court, it is contradictory to argue that a defendant may be mentally incompetent, and yet he may knowingly or intelligently waive his right to have the court determine his mental capacity to stand trial. *Pate* [*v. Robinson*, 383 U.S. 375, 86 S.Ct. 836, 15 L.Ed.2d 815 (1966)], *State v. Harris*, 406 So.2d 128 (La. 1981).

> Once a motion to appoint a sanity commission has been made, it takes on a life of its own as nothing further can happen without resolving the issue of the defendant's mental capacity. An attorney independently waiving or withdrawing the motion is an insufficient resolution of the issue. The trial court, not the defense attorney, is mandated to determine the defendant's mental capacity to proceed and rule on the motion. LSA-C.Cr.P. Arts. 642 and 643.

*Id.* at 473.

Accordingly, we find that the trial court erred in allowing the withdrawal of the defendant's motion to appoint a sanity commission without first specifically ruling on the motion. However, unlike in *Carney*, we find that the trial court specifically considered the issue when it denied a similar motion contesting the defendant's capacity, which was later filed by the defendant's wife, allegedly on his behalf.

The motion, which was filed on August 11, 2015, requested the appointment of a sanity commission to determine both the defendant's mental capacity to proceed and his sanity at the time of the offenses. Court minutes from that date

6

reflect that a hearing was held to consider, among other issues, whether the defendant had the mental capacity to proceed. The defendant, who was present and represented by counsel, testified in court, and at the close of the hearing, the trial court denied the motion in writing. In doing so, the trial court specifically determined that there were no reasonable grounds to doubt the defendant's competency to proceed. This matter was further laid to rest on August 13, 2015, when defense counsel specifically refused in open court to join in the motion.

In addition to addressing the defendant on August 11, 2015, the trial court had the benefit of having him before it on numerous other occasions when his competency to proceed was discussed. On July 29, 2013, after the withdrawal of the initial motion to appoint a sanity commission, defense counsel informed the trial court that he would be filing another motion for a sanity commission to determine the defendant's sanity at the time of the offenses. On September 30, 2013, defense counsel, in the presence of the defendant, informed the trial court that he had filed a motion for a sanity commission to determine the defendant's sanity solely at the time of the offense. In doing so, defense counsel stated, "[w]e are conceding that he is competent to proceed. The motion was very specific on that." Defense counsel further indicated that the defendant wished to change his plea on the charge of first degree murder from not guilty to not guilty and not guilty by reason of insanity. In light of this change, the state agreed with the appointment of a sanity commission and agreed to submit an order for the trial court's signature.

The October 17, 2013 order appointed Dr. Michelle Garriga, M.D. and Dr. Rafeal Salcedo, Ph.D. to determine the defendant's sanity at the time of the offenses. Court minutes dated August 10, 2015 and November 2, 2015, indicate that defense counsel informed the trial court that the defendant had been found

competent to stand trial by these experts. The defendant's capacity to proceed is further reflected in Dr. Garriga's January 20, 2014 report and in Dr. Salcedo's November 13, 2015 report, which references his November 4, 2013 finding that the defendant was competent to stand trial.

The defendant's competency was also addressed at the January 22, 2016 hearing on defense counsel's motions to withdraw as counsel and to continue the hearing. During the hearing, the trial court read from Dr. Salcedo's November 4, 2013 report, including the finding that the defendant was competent to stand trial. The state further relied on Dr. Garriga's October 11, 2015 and Dr. Salcedo's November 13, 2015 reports as part of its factual basis during the defendant's February 12, 2016 guilty plea proceeding. Although these reports address the defendant's mental state at the *time of the commission of the offense*, Dr. Salcedo, as stated previously, referenced his earlier finding that the defendant was competent to stand trial. During this hearing, a separate trial judge found, after an extensive *Boykin* examination, that the defendant acted knowingly, intelligently, and voluntarily in waiving his constitutional rights before accepting his guilty plea. Thus, the trial judge acknowledged that the defendant was, in fact, competent to enter his plea.

In *State v. Bonicard*, 98-665 (La.App. 4 Cir. 8/4/99), 752 So.2d 184, *writ denied*, 99-2632 (La. 3/17/00), 756 So.2d 324, one of the two physicians who examined the defendant testified he was competent to proceed, and the parties stipulated that the remaining physician's testimony would be the same. After the matter was submitted, the trial court set the case for trial without specifically stating that it found the defendant competent. The fourth circuit held that the trial court's setting of a trial date indicated that it found the defendant competent to proceed. Additionally, the court minutes and the docket master both indicated the

8

defendant was found competent. The instant case presents an even stronger rational for our conclusion in that the trial court specifically determined that the defendant had the mental capacity to proceed at the August 11, 2015 hearing.

Accordingly, while we conclude that it was error for the trial court to allow defense counsel to withdraw the motion to appoint a sanity commission at the hearing on January 22, 2013, we find that error to be harmless in light of the trial court's denial of the August 11, 2015 motion for a sanity commission. Given this ruling, together with the overwhelming evidence in support thereof, we find that there can be no doubt that the defendant was competent during the entirety of these proceedings. Therefore, while this court concedes the error of the trial court, we find this to be a harmless error in light of the trial court's subsequent actions.

## ASSIGNMENTS OF ERROR

The defendant alleges two errors on appeal:

1. The trial court erred by sentencing [the defendant] to forty-years [sic] at hard labor for Manslaughter and not fully considering the mitigating factors in this case.

2. The trial court erred by making the sentence for one charge consecutive to the others when all three charges resulted from one act of violence.

In his first assignment of error, the defendant argues that the trial court erred in sentencing him to the maximum forty-year sentence for manslaughter without fully considering the mitigating factors in his case, such as his mental illness, his documented pleas for help with his mental issues, his lack of a criminal record demonstrating violence toward people, and the lack of evidence demonstrating that he was wicked or malicious in his normal life and interactions. He noted that the only evidence of prior violence arose from a protective order obtained by his step-father, after he evicted the defendant and his family from a home owned by his mother after her death. The defendant also questions the trial court's failure to

9

mention the mitigating fact that he immediately called 911 to obtain help for the victims and its conclusion that his attempt to ask directions from a motorist was, in fact, an attempted carjacking. The defendant claims that there is nothing in the record to establish that the car at issue had a Mississippi license plate or any other feature that would indicate that the driver was from another state and would not be a good candidate to provide directions.

In his second assignment of error, the defendant contends that the trial court erred in ordering the sentences for attempted manslaughter to run consecutively, rather than concurrently, to the manslaughter sentence, as these three offenses resulted from a single incident.[2] We will address these two assignments together.

"[M]aximum sentences are generally reserved for the worst offenders and the worst offenses." *State v. Fallon*, 15-1116, p. 6 (La.App. 3 Cir. 4/6/16), 189 So.3d 605, 609. The standard of review applicable to a claim of excessive sentence was set out by this court in *State v. Barling*, 00-1241, 00-1591 p. 12 (La.App. 3 Cir. 1/31/00), 779 So.2d 1035, 1042-43, *writ denied*, 01-838 (La. 2/1/02), 808 So.2d 331:

> La. Const. art. I, § 20 guarantees that, "[n]o law shall subject any person to cruel or unusual punishment." To constitute an excessive sentence, the reviewing court must find the penalty so grossly disproportionate to the severity of the crime as to shock our sense of justice or that the sentence makes no measurable contribution to acceptable penal goals and is, therefore, nothing more than a needless imposition of pain and suffering. *State v. Campbell*, 404 So.2d 1205 (La.1981). The trial court has wide discretion in the imposition of sentence within the statutory limits and such sentence shall not be set aside as excessive absent a manifest abuse of discretion. *State v. Etienne*, 99-192 (La.App. 3 Cir. 10/13/99); 746 So.2d 124, *writ denied*, 00-0165 (La.6/30/00); 765 So.2d 1067. The relevant question is whether the trial court abused its broad sentencing

---

[2]The defendant's plea agreement was "open ended" as to his sentence for manslaughter. The defendant's plea agreement as to the attempted manslaughter charges was "capped" at fifteen years. The decision of whether to run the sentences concurrently or consecutively was left up to the court, but the agreement required that the combined sentences must not exceed fifty years. The plea agreement expressly reserved the defendant's right to appeal the excessiveness of any sentence imposed.

discretion, not whether another sentence might have been more appropriate. *State v. Cook*, 95-2784 (La.5/31/96); 674 So.2d 957, *cert. denied*, 519 U.S. 1043, 117 S.Ct. 615, 136 L.Ed.2d 539 (1996).

In *State v. Frazier*, 14-1132, pp. 14-15 (La.App. 3 Cir. 3/4/15), 157 So.3d 1266, 1275-76 (alteration in original), *writ denied*, 15-657 (La. 2/26/16), 187 So.3d 467, this court stated:

> Even though a penalty falls within the statutory sentencing range, it may still be unconstitutionally excessive:
>
> > In deciding whether a sentence is shocking or makes no meaningful contribution to acceptable penal goals, an appellate court may consider several factors including the nature of the offense, the circumstances of the offender, the legislative purpose behind the punishment and a comparison of the sentences imposed for similar crimes. While a comparison of sentences imposed for similar crimes may provide some insight, "it is well settled that sentences must be individualized to the particular offender and to the particular offense committed." Additionally, it is within the purview of the trial court to particularize the sentence because the trial judge "remains in the best position to assess the aggravating and mitigating circumstances presented by each case."
>
> *State v. Smith*, 02-719, p. 4 (La.App. 3 Cir. 2/12/03), 846 So.2d 786, 789, *writ denied*, 03-562 (La. 5/30/03), 845 So.2d 1061 (citations omitted). "[T]he trial judge need not articulate every aggravating and mitigating circumstance outlined in [La.Code Crim.P.] art. 894.1[;] the record must reflect that he adequately considered these guidelines in particularizing the sentence to the defendant." *State v. Smith*, 433 So.2d 688, 698 (La.1983) (citing *State v. Ray*, 423 So.2d 1116 (La.1982); *State v. Keeney*, 422 So.2d 1144 (La.1982); *State v. Duncan*, 420 So.2d 1105 (La.1982)). "The appellate court shall not set aside a sentence for excessiveness if the record supports the sentence imposed." La.Code Crim.P. art. 881.4(D).

At the sentencing hearing, the state introduced the victim impact statements and the sanity commission reports of Drs. Salcedo and Garriga into evidence. The defense presented the testimony of several witnesses at the hearing.

Bobbie Leblanc, who met the defendant when he began living in her home with her daughter, shortly after his discharge from the Marines, testified that he

11

experienced issues from his time in Iraq. These included flashbacks to scenes he witnessed, including the deaths of children; dealing with the death of a close friend; his fear of sudden noises; and his need to sleep with the door open and a light on. Ms. LeBlanc testified that loud noises caused a "wild look" to come over the defendant and that she spent twenty minutes trying to calm him down from one such incident. She testified that the defendant was unable to obtain treatment from the Veterans Administration (VA) because he did not have an honorable discharge. Instead, she stated that he self-medicated by taking Adderall and using marijuana and that he started using alcohol extensively when he quit smoking marijuana in order to pass urine tests.

Ms. LeBlanc testified that she was not surprised by the shootings. She said that although she tried to help him, the defendant had nowhere to turn, and nobody would help him. On cross-examination, she stated that he was not violent toward anyone in her family except her daughter. She stated that there were a few fights between them where she had to intervene.

The defendant's wife, Robyn Duhon, testified that they were living in a barbeque house behind the victims' home at the time of the incident. She stated that on the morning of the incident, a noisy weed eater and blower were being operated outside of their home and that a rock hit the window. Mrs. Duhon testified that the defendant, who had been sleeping, got up and "walked out like in a daze." When he returned home, she stated that he was running, and he said to his son, "Come on, Bennett, let's go, let's go."

Mrs. Duhon testified that when he grabbed her purse to get her keys, he held her down and put his hands on her neck, and "[s]trangled" her, when she questioned his actions. She testified she did not believe that he was in his right mind at that moment. After he released her, she said that the defendant took his

son and left in her car. On cross-examination, Mrs. Duhon testified that the defendant dropped his son off at his brother's job site without harming him. She responded affirmatively when asked if the defendant knew what he did was wrong.

During questioning by the trial court, Mrs. Duhon testified that she did not "feel that in his heart [the defendant] intended to hurt anyone that day[,]" and she believed he had a flashback and "was not all there." With regard to the weapon used in the incident, Mrs. Duhon testified that the defendant's firearms were kept in a closet in her grandmother and uncle's home because he was prevented from possessing firearms as a result of a protective order obtained against him by his step-father. She testified that when she entered the kitchen after the shooting, she saw the defendant's black gun on the table.

The defendant testified that he entered the Marines straight out of high school and provided details of his training prior to his Iraq deployment. While in Iraq, he stated that he drove trucks for an infantry platoon on the front lines. There, he said that he witnessed many killings. After the war, he learned that a close friend of his was killed in Iraq. The defendant testified that he named his son after this friend.

During the war, the defendant testified that he suffered from anxiety, depression, and the inability to sleep, but he had "no way to get help." After returning stateside to his duty station, the defendant testified that he thought he was "all right" because he was back home. Although he felt that he had a problem, he said that he did not seek help, choosing to self-medicate with marijuana instead. He stated that the marijuana helped with his anxiety, but it eventually caused him to fail a drug test, resulting in his discharge. The defendant testified that he was not offered any rehabilitation and that his later attempts to obtain treatment from the VA were rejected because his discharge was "other than honorable." He said

13

that he had no medical insurance at that time and that he tried unsuccessfully for years to get his discharge upgraded.

The defendant explained that the restraining order against him was brought by his step-father, Wilmer Hebert, after he evicted the defendant and his family from property they were fighting over after his mother's death. When asked what caused his step-father to secure a restraining order, the defendant explained that they "went over there and [were] trying to get him to let us stay and settle and he didn't want [to.]" He stated that Mr. Hebert told him that he would have the defendant arrested if he went to the property again, and he subsequently obtained the restraining order against him. The defendant testified that he owned a shotgun and a 9mm Ruger, which he purchased after he was threatened by an employee he had fired.

The defendant described his relationships with the two female victims as good. He said he did not talk to Mr. Thibodeaux much because "he was never around." Other than a DWI, the defendant had no criminal record. When asked why he shot the victims, he said, "I have no idea, sir. Mental illness." He testified that he did not recall the shootings, but that he remembered waking up in a panic in fear for his life because he heard a noise. He said that he instinctively ran to get his pistol. The defendant testified that the next thing he recalled was calling 911, reporting that he shot some people, and providing the Breaux Bridge address. He said that he then drove to his childhood home in Abbeville, where "[he] felt safe." This was where he was arrested. When asked if he attempted a carjacking, he said that he remembered trying to ask some people for directions, but he had no gun and did not ask anyone for their vehicle.

On cross-examination, the defendant testified that he did not shoot his wife and son because he left his gun in the house. He stated that he realized what had

14

happened when he went back into the house and "Mr. Charlie said call 911 . . . And I called 911 because I had shot some people." After the shooting, the defendant admitted that he forced the car keys from his wife and then took his son to his brother's job site, but could not explain why, responding, "I have no idea, sir." He affirmed that he wanted his son to be safe and that he left to avoid arrest. Although he admitted to using marijuana, Adderall, and also Lortab (which he was prescribed due to a job injury), he denied using or taking any such substance on the day of or the day prior to the shootings.

After dropping his son off, the defendant explained that he was heading to his childhood home after the shootings. He stated that he tried to ask for directions because he was dazed, confused, and unsure of where he was, being unfamiliar with Breaux Bridge. He said that he followed a car off the interstate and asked the occupants, whom he believed to be a man and a woman from Mississippi, for directions. When asked why he would ask someone from Mississippi for directions in Louisiana, he replied, "I wasn't in my right state of mind." The defendant testified that police began following him when he reached the main highway in Abbeville and arrested him when he arrived at his childhood home. The defendant said he had no idea why he left the gun at the scene of the incident, stating, "Wasn't in my right state of mind. I mean I wasn't trying to hide it."

Dr. Marc Zimmerman, an expert in the field of psychology, testified that he reviewed the defendant's military records and, over the course of four hours, interviewed and performed tests on the defendant. He concluded that the defendant was suffering from Post-Traumatic Stress Disorder (PTSD) brought on by his service in Iraq. He stated that Ms. Leblanc's testimony regarding the defendant's behavior was consistent with his findings. Dr. Zimmerman confirmed that someone getting up out of a sound sleep, entering a separate home, grabbing a

15

gun, and shooting three people is consistent with someone suffering from PTSD. He confirmed that it is possible to develop PTSD from being incarcerated and that the defendant could have developed this disorder from his time in jail; however, he said that this would not explain the defendant's actions before he went to jail.

Dr. Zimmerman had no explanation for why the defendant would shoot the three victims, but not shoot his wife and son. He stated that what happened was "an illogical and irrational thing." He said that the defendant told him that he was afraid he was going to be harmed by someone and when he heard someone say, "Call 911," it brought him back to reality. Based on what the defendant told him, Dr. Zimmerman stated that it was his opinion that the defendant could not distinguish between right and wrong at the time of the incident. With regard to Dr. Salcedo's report, which concluded that the defendant was capable of distinguishing between right and wrong and that he was legally sane at the time of the offenses, Dr. Zimmerman said that he did not know what Dr. Salcedo based his findings on and that the defendant's presentation may have been different when he saw him. His answer was the same with regard to Dr. Garriga's report, which reached the same conclusion as Dr. Salcedo's. With regard to Dr. Garriga's assertion that the defendant appeared to be psychotic at the time of the offenses, but that the psychosis was consistent with a substance induced psychosis, rather than PTSD or another mental illness, Dr. Zimmerman testified that he was not aware of any instance where a diagnosis of PTSD was based on drug use.

After hearing the evidence, the trial court summarized its reasons for sentencing the defendant. It noted that upon the death of Mrs. Hebert, the defendant faced the death penalty or life imprisonment for first degree murder and fifty years on each of the two counts of attempted first degree murder. The trial court then recounted the details of the shootings of the three elderly victims, noting

that the defendant purposely emptied his clip as the victims lay on the kitchen floor and that he told the investigating officer that he would have emptied another clip if he had had it.

In addressing whether the defendant had a mental breakdown or anger issues, the trial court stated that it felt that the defendant's actions were evil. It then referenced the reports of Drs. Salcedo and Garriga, noting Dr. Garriga's finding that the defendant's psychosis was substance induced, rather than mentally induced, which is necessary to qualify for the insanity defense.

The trial court then detailed the defendant's actions following the shootings, finding them to be "calculated well throughout." It stated that even if the defendant suffered from some type of disorder, it did not find, "as [Dr. Zimmerman] did," that it affected the defendant's understanding of what he did. The trial court then reviewed in detail the sentencing guidelines contained in La.Code Crim.P. art. 894.1(A) and (B) and specifically found that all of the factors favoring the imposition of imprisonment were applicable to the defendant's crimes.

With regard to mitigating circumstances, the trial court stated:

> This Court has searched long and hard for any mitigating factors on behalf of Mr. Duhon. I have been unable to find any mitigating factors except he has two children, he has a wife, he served in the military but he was discharged due to his use of drugs, which he continued to use during this period of time and up [till] the time he murdered Mrs. Hebert and he shot Mr. and Mrs. Thibodeaux.
>
> His criminal history shows in 2010 he was found guilty of Operating a Vehicle While Intoxicated. However, any mitigating factors he may have is [sic] overwhelmed by all of the earlier stated aggravating factors.

The record indicates that the trial court was fully aware of the potentially mitigating factors concerning the defendant's mental issues, his history of non-violent crime (DWI), the fact that the protective order against him had resulted from a family-property dispute, and the lack of malice in his "normal life."

17

Acknowledging that the defendant might suffer from some disorder, the trial court chose to rely on the conclusions reached by Drs. Garriga and Salcedo, rather than the opinions of Dr. Zimmerman.

As for the defendant's immediate call to obtain help for the victims, the defendant testified that his call to 911 was in response to a request by Mr. Thibodeaux; thus, it was not entirely of his own volition. Additionally, the defendant's assertion that the record does not establish that Ms. Spikes' car had a Mississippi license plate or any feature identifying it as an out-of-state vehicle was refuted by his own testimony that the couple in the car he approached were from Mississippi.

In *State v. Plauche*, 09-400 (La.App. 3 Cir. 1/6/10), 32 So.3d 852, *writ denied*, 10-302 (La. 9/24/10), 45 So.3d 1070, this court upheld the imposition of the maximum sentence for manslaughter under circumstances where the defendant shot his wife in the neck two weeks after he learned she was having an affair and failed to offer her any aid after the shooting. In mitigation, the trial court noted that the defendant had no history of criminal activity, the circumstances were unlikely to reoccur, and it noted that imprisonment would impose excessive hardship on the defendant's children. The trial court concluded that although the jury had convicted the defendant of manslaughter, the facts were more akin to a second degree murder, the crime with which he was originally charged.

In *State v. Soriano*, 15-1006 (La.App. 3 Cir. 6/1/16), 192 So.3d 899, this court held that the imposition of the maximum sentence for manslaughter was not excessive where the defendant, a first felony offender, who was cooperative after his arrest, stabbed the victim once and, after the victim retreated, chased him down and stabbed him again. The defendant's claim of self-defense was rejected by the

18

trial court, which concluded that there was no explanation for the defendant's failure to retreat and his act of chasing the victim and stabbing him again.

In the present case, we find that the trial court did not abuse its discretion in imposing the maximum forty-year sentence. The entry of the guilty plea to manslaughter benefitted the defendant substantially because he faced the death penalty or life imprisonment without the benefit of parole, probation, or suspension of sentence for first degree murder. This was a heinous crime against defenseless, elderly victims, and, as the trial court held, two experts concluded that the defendant was capable of distinguishing right from wrong at the time of the shootings. Accordingly, we affirm the defendant's sentence for manslaughter, finding that the trial court did not abuse its discretion by imposing a forty-year sentence for the crime.

Turning now to the defendant's claim that the trial court erred in ordering his two eight-year sentences to run consecutively to his forty-year sentence, we note that La.Code Crim.P. art. 883 provides in pertinent part:

> If the defendant is convicted of two or more offenses based on the same act or transaction, or constituting parts of a common scheme or plan, the terms of imprisonment shall be served concurrently unless the court expressly directs that some or all be served consecutively.

Although concurrent sentences are preferred in the imposition of sentences for offenses based upon a common scheme or plan, the trial court has the discretion to impose consecutive sentences provided "that the trial court articulates particular justification for doing so at sentencing." *State v. Richardson*, 16-107, p. 30 (La.App. 3 Cir. 12/28/16), 210 So.3d 340, 360. The factors upon which a trial court may base consecutive sentences include "the offender's past criminality, violence in the charged crimes, or the risk he or she poses to the general safety of the community." *State v. Thomas*, 98-1144, p. 1 (La. 10/9/98), 719 So.2d 49, 49.

19

In the present case, the trial court ordered the two eight-year attempted manslaughter sentences to run concurrently, but ordered that they run consecutively to his forty-year manslaughter sentence. When defense counsel objected to the imposition of consecutive sentences, the trial court stated:

> Mr. Legros, when somebody walks into a kitchen and kills a ninety year old woman, I have problems with that. Then turns around and shoot[s] a seventy-two year old man and a sixty-nine year old woman and makes the statement to the police that he emptied his clip. Then he goes in his house and batters his wife, brings his kid somewhere to be safe, gets on the highway and tries to carjack a young woman for her car, because now he knows the police [are] looking for him, and he darts off to Abbeville.

The reasons given by the trial court amply support the imposition of consecutive sentences. Further, even in the absence of articulated reasons for imposing consecutive sentences, "the record as a whole can be considered in determining whether consecutive sentences were justified." *State v. Blunt*, 16-220, p. 34 (La.App. 3 Cir. 9/28/16), 201 So.3d 358, 378. Thus, the substantial benefit the defendant received as a result of the plea bargain can be considered and further supports the imposition of consecutive sentences. Accordingly, we affirm the defendant's sentences, finding that the trial court did not abuse its discretion in ordering the defendant's sentences for attempted manslaughter to run consecutively to his sentence for manslaughter.

## DISPOSITION

For the foregoing reasons, the defendant's convictions and sentences are affirmed.

**AFFIRMED.**