DISTRICT COURT OF APPEAL OF FLORIDA
SECOND DISTRICT

_____

CATHERINE DAVIS KENNEDY, M.D.,

Appellant,

v.

ROBERT SLOCKETT, M.D., and
PATHOLOGY ASSOCIATES, P.A.,

Appellees.

No. 2D2024-1681

_____

June 11, 2025

Appeal pursuant to Fla. R. App. P. 9.130 from the Circuit Court for
Pinellas County; Thomas M. Ramsberger, Judge.

Craig L. Berman of Berman Law Firm, P.A., St. Petersburg, for Appellant.

Kristen M. Fiore of Akerman LLP, Tallahassee; and Kirk S. Davis of
Akerman LLP, Tampa, for Appellee Robert Slockett, M.D.

Candy L. Messersmith of Rumberger, Kirk & Caldwell, P.A., Orlando, for
Appellee Pathology Associates, P.A.

LaROSE, Judge.

Catherine Davis Kennedy, M.D., appeals the trial court's order
compelling arbitration of the claims alleged in her lawsuit against a
former coworker and employer. We have jurisdiction. *See* Fla. R. App. P.

9.130(a)(3)(I).  We reverse.  The nexus between the claims and the arbitration provision contained in Dr. Kennedy's Employment Agreement is insufficient to mandate arbitration.

## Background

Dr. Kennedy was an employee and shareholder of Pathology Associates, P.A.  Robert Slockett, M.D., too, is an employee and shareholder.  Dr. Kennedy's employment terms were memorialized in a 2007 Employment Agreement.

Over time, the shareholders' relationship soured.  The office scuttlebutt was that Dr. Kennedy and another shareholder were "colluding . . . [to] manipulat[e] their scheduled leave time to disadvantage one or more other shareholders."  Apparently, this action contravened an informal "practice of conferring with and accommodating each other when reserving future leave time."  Dr. Kennedy suggests that her Employment Agreement does not detail any formal process, procedure, or guidelines for scheduling leave.  Nevertheless, she contends that she "followed the usual procedures when she reserved time off . . . [for] the spring of 2023 when schools were closed for spring break."

Concerns over Dr. Kennedy's 2023 leave time erupted in April 2022.  She entered Dr. Slockett's office to discuss medical test results.  During "that same discussion, [Dr. Kennedy] tried to address the controversy over scheduling of future leave."  According to the complaint, Drs. Kennedy and Slockett's duties as co-owners "includ[ed] discussing and coordinating the scheduling of leave time with other co-owners."

Allegedly, Dr. Slockett became enraged.  He attempted "to deter [Dr. Kennedy] from exercising her right to reserve days off that coincided with the closing of schools for spring break."  He allegedly sprung from his

2

chair and invaded Dr. Kennedy's personal space in a threatening manner.  He gesticulated wildly and screamed expletives at Dr. Kennedy.  He allegedly grabbed her arms, spun her around, yelled "You get the fuck out!" and forcibly shoved her out of his office.  Dr. Kennedy returned later.  Dr. Slockett's ire had not abated.  He thundered, "[Y]ou shut the fuck up!" and "[Y]ou stay the fuck out!"

Dr. Kennedy emailed the then-president[1] of Pathology Associates demanding that Dr. Slockett be disciplined.  Pathology Associates ignored her demands.

Thereafter, she filed a three-count complaint.  Count I alleged battery against Dr. Slockett.  Count II alleged that "Pathology Associates [wa]s vicariously liable for [Dr.] Slockett's battery."  Count III asserted a cause of action for "ratification" against Pathology Associates for endorsing or otherwise condoning Dr. Slockett's conduct.  Allegedly, Pathology Associates took no action to investigate the incident, failed to discipline Dr. Slockett, and "orchestrated [her] removal from Pathology Associates."

Dr. Slockett and Pathology Associates moved to compel arbitration under Paragraph 16 of Dr. Kennedy's Employment Agreement: "Any controversy or claim arising out of, or relating to this Agreement, or the breach[,] shall be settled by arbitration in accordance with the Florida Arbitration Code unless otherwise provided herein."  Because the alleged incident occurred during a workplace dispute, they contend that Dr. Kennedy must arbitrate.

---

[1] The president was her brother, Kern Davis, M.D.

The trial court ordered arbitration. It found that "there is a requisite nexus" between the allegations in Dr. Kennedy's complaint and the arbitration provision in her Employment Agreement.

## Analysis

Dr. Kennedy insists that the trial court erred in finding a sufficient nexus between her Employment Agreement and her claims against Dr. Slockett and Pathology Associates. She stresses that resolution of her tort claims does not require interpretation of, or reference to, her Employment Agreement.

We review the order de novo. *See SCG Harbourwood, LLC v. Hanyan*, 93 So. 3d 1197, 1199 (Fla. 2d DCA 2012) ("Whether a particular dispute is subject to arbitration is a matter of contract interpretation that we review de novo."). We limit our review to Dr. Kennedy's complaint. *See Jackson v. Shakespeare Found., Inc.*, 108 So. 3d 587, 592-93 (Fla. 2013) (explaining that review of an order on a motion to dismiss and compel arbitration "is limited to the four corners of the complaint and its incorporated attachments").

"Generally, the three fundamental elements that must be considered when determining whether a dispute is required to proceed to arbitration are: (1) whether a valid written agreement to arbitrate exists; (2) whether an arbitrable issue exists; and (3) whether the right to arbitration was waived." *Id.* at 593 (citing *Seifert v. U.S. Home Corp.*, 750 So. 2d 633, 636 (Fla. 1999)). Only the second element is before us. More specifically, whether Dr. Kennedy's claims fall within the arbitration provision's scope.

Florida favors arbitration. *See UATP Mgmt., LLC v. Barnes*, 320 So. 3d 851, 857 (Fla. 2d DCA 2021). "That said, the 'determination of whether an arbitration clause requires arbitration of a particular dispute

4

necessarily rests on the intent of the parties.' " *Austin Com., L.P. v. L.M.C.C. Specialty Contractors, Inc.*, 268 So. 3d 215, 219 (Fla. 2d DCA 2015) (quoting *MDC 6, LLC v. NRG Inv. Partners, LLC*, 93 So. 3d 1145, 1147 (Fla. 2d DCA 2012)).

We examine the plain language of the arbitration provision to discern intent. *See Bailey v. Women's Pelvic Health, LLC*, 309 So. 3d 698, 701 (Fla. 1st DCA 2020) ("Determining whether an arbitrable issue exists requires the court to examine the plain language of the parties' arbitration agreement."). As we recently stated:

> It is the text of the arbitration clause before us that governs and determines whether the parties must submit their claims to arbitration. The words determine the outcome. . . . "The intent of the parties to a contract, as manifested in the plain language of the arbitration provision and contract itself, determines whether a dispute is subject to arbitration."

*Venn Therapeutics, LLC v. CAC Pharma Invs., LLC*, 382 So. 3d 6, 13 (Fla. 2d DCA 2024) (citation omitted) (quoting *Jackson*, 108 So. 3d at 593).

Our supreme court also observed that the arbitration provision's language reveals its meaning. *See Seifert*, 750 So. 2d at 636. "For example, clauses including all claims or controversies 'arising out of' the subject contract" limit arbitration to "claims having some direct relation to the terms and provisions of the contract." *Id.* In contrast, use of "the phrase 'arising out of or relating to' the contract has been interpreted broadly to encompass virtually all disputes between the contracting parties, including related tort claims." *Id.* at 637 (holding that the language "arising out of or relating to" the contract is broad and "encompass[es] virtually all disputes between the contracting parties"). To come within the reach of a broad arbitration clause, the dispute "must, at a minimum, raise some issue the resolution of which requires

5

reference to or construction of some portion of the contract itself." *Id.* at 638.

The arbitration provision, here, is a "broad clause."

Consequently, we must consider "whether a 'significant relationship' exists between the claim and the agreement containing the arbitration clause, regardless of the legal label attached to the dispute (i.e., tort or breach of contract)." *Id.* at 638. A "significant relationship" requires a "contractual nexus" between the contract and the dispute. *Id.*

Critically, a "contractual nexus" contemplates that "the resolution of the disputed issue requires either reference to, or construction of, a portion of the contract." *Jackson,* 108 So. 3d at 593. This nexus "emanates from an inimitable duty created by the parties' unique contractual relationship." *Id.* Yet, "a claim does not have a nexus to a contract if it pertains to the breach of a duty otherwise imposed by law or in recognition of public policy, such as a duty under the general common law owed not only to the contracting parties but also . . . the public." *Id.*

With these black-letter rules in place, we examine their practical application. We survey two seminal cases: *Seifert* and *Jackson.*

In *Seifert,* the supreme court addressed whether a wrongful death claim fell within the scope of a broad arbitration provision found in a home-purchase contract. 750 So. 2d at 635, 637. "No," said the court. *See id.* at 640-41. Thus, the dispute was not arbitrable. *See id.* at 642.

The *Seifert* lawsuit arose after the Seiferts purchased a home from U.S. Home. *Id.* at 635. After they moved in, Mr. Seifert died from inhaling carbon monoxide inside the home. *Id.* Ms. Seifert, as her late husband's personal representative, sued U.S. Home for strict liability, negligence, and breach of warranties. *Id.* U.S. Home moved to compel arbitration under a broad arbitration provision found in the purchase

6

contract: "Any controversy or claim arising under or related to this Agreement or to the Property . . . or with respect to any claim arising by virtue of any representations alleged to have been made by the Seller or Seller's representative, shall be settled and finally determined by mediation or binding arbitration . . . ." *Id.*

The supreme court was unpersuaded. *See id.* at 640-42. The claims lacked a "significant relationship" to the purchase contract. *Id.* Rather, they were founded in the common law tort of negligence, unrelated to any unique legal duties imposed by the purchase contract. *Id.* Because the arbitration provision made no mention of personal injury or negligence claims, the supreme court concluded that the parties did not intend to arbitrate such claims. *Id.* at 641-42.

In *Jackson,* 108 So. 3d at 593, the supreme court revisited *Seifert's* "significant relationship" test. *Jackson* involved a contract to buy real property. *Id.* at 590. The contract contained a broad arbitration provision. *Id.* at 591, 593. Relying on an advertisement promising that a "Wetlands study verifie[d] No Wetlands," a realty team purchased the property. *Id.* at 589-90. The sellers, however, knew that some twenty-five percent of the property was wetlands. *Id.* at 590.

The buyers sued for fraudulent misrepresentation. *Id.* The sellers moved to dismiss, arguing that the fraud claim was subject to an arbitration provision covering "[a]ll controversies, claims, and other matters in question arising out of or relating to this transaction or this Contract or its breach." *Id.* at 590-91.

The supreme court agreed, concluding that the fraud claim "ha[d] a clear contractual nexus with, and thus a significant relationship to, the contract." *Id.* at 594.

Distinguishing *Seifert,* the court observed that

although the fraud claim is based on common law fraud, it is inextricably intertwined with both the circumstances that surrounded the transaction from which the contract emanated and the contract itself. . . . [T]he genesis of the fraud claim is that the [sellers] knowingly misrepresented facts in the published advertisement that the subject property did not contain wetlands when, in fact, the [sellers] knew of the wetlands' existence through their own previous study which established that wetlands constituted 25% of the property. The [buyers] allegedly relied on the misrepresentations in the published advertisement and entered into the contract. The subsequent damages the [buyers] allegedly incurred arose from the contract itself, i.e., by entering into the contract, the [buyers] suffered the economic damage of owning property [they were] unable to develop or sell.

. . . [U]nlike the negligence-type claims in *Seifert,* the fraud claim at issue here is inextricably intertwined with both the transaction from which the contract arose and the contract itself—the reliance element of the claim emanates from the transaction from which the contract arose, and the damages element of the claim arises from the execution and existence of the contract itself. Accordingly, the fraud claim has a significant relationship to the contract and is within the scope of the contract's broad arbitration provision.

Furthermore, the resolution of the fraud claim requires reference to and construction of both the contract's arbitration provision and its "as is" provision. In particular, the arbitration provision of the contract limits the remedies for disputes arising from the contractual relationship to those provided in the contract, stating that the "arbitrator may not alter the Contract terms or award any remedy not provided for in this Contract." The express remedies in the contract are limited to the parties' rights in the event of a default, and the contract does not mention the parties' remedial rights in the event of a fraud or tort action.

*Jackson,* 108 So. 3d at 595-96 (footnotes omitted).

As in *Seifert,* but unlike *Jackson,* Dr. Kennedy's claims are unrelated to the parties' contractual relationship. Indeed, the

8

Employment Agreement is a standard physician's employment contract setting forth the employer's and employee's respective duties, rights, and obligations related to the medical practice (i.e., compensation, the scope of employee's duties and the provision of professional medical services, fees and responsibilities to patients, covenants against competition, etc.). Nothing indicates that the parties intended to arbitrate tort claims such as those alleged by Dr. Kennedy. *See Seifert*, 750 So. 2d at 641. We cannot see how such an agreement can compel arbitration of claims arising from what can best be described as a violent scrum.

It is equally clear that her claims do not rely upon, or require reference to, the Employment Agreement. Whether Dr. Kennedy rightfully or wrongfully scheduled leave time is irrelevant. Allegedly, Dr. Slockett battered her. It stretches credulity to say that the alleged confrontation occurred within the scope of the physicians' duties.

Dr. Kennedy's claims address obligations that Dr. Slockett and Pathology Associates would have to extend to any member of the general public. *See Dewees v. Johnson*, 329 So. 3d 765, 766-67, 772 (Fla. 4th DCA 2021) (concluding that a homeowner's negligence claims against a real estate developer for injuries she sustained from falling off of her bike lacked a significant relationship to the purchase agreement and the broad arbitration provision contained therein because the "claims do not refer to or implicate contractual duties created or governed by the Purchase Contract or Dwelling Warranty but concern duties generally owed to the public"); *see also Florez v. Broward Sheriff's Off.*, 270 So. 3d 417, 421 n.2 (Fla. 4th DCA 2019) ("[T]he intentional tort of battery is not premised on the existence of a duty between the parties." (quoting *Lynn v. Burnette*, 531 S.E.2d 275, 279 (N.C. Ct. App. 2000))). A nexus is missing. *See Saunders v. St. Cloud 192 Pet Doc Hosp., LLC*, 224 So. 3d

9

336, 338-39 (Fla. 5th DCA 2017) ("Although the employment agreement created the legal relationship between Pet Doc and Saunders, her claims did not relate directly to the contract itself. Instead, Saunders's complaint addressed Pet Doc's duties under an Osceola County Ordinance (employer sex discrimination) and common law (negligence), not any particular duties created by the contract. Importantly, an employer-employee relationship may exist even without the execution of an employment agreement. Even without entering this agreement, Saunders could have raised the identical claims. . . . Thus, the claims' general relation to her employment does not demand consideration of the underlying employment agreement." (citations omitted)).

Nor are Dr. Kennedy's claims "inextricably intertwined" with the Employment Agreement. *Compare Jackson,* 108 So. 3d at 595 ("[T]he [common law] fraud claim at issue here is inextricably intertwined with both the transaction from which the contract arose and the contract itself—the reliance element of the claim emanates from the transaction from which the contract arose, and the damages element of the claim arises from the execution and existence of the contract itself. Accordingly, the fraud claim has a significant relationship to the contract and is within the scope of the contract's broad arbitration provision."), *with Saunders*, 224 So. 3d at 338-39.

Her claims do not "emanate[] from an inimitable duty created by the parties' unique contractual relationship." *Jackson,* 108 So. 3d at 593. Members of the public possess the right to be free from battery and an employer must furnish a safe workplace to its employees. *See id.* ("[A] claim does not have a nexus to a contract if it pertains to the breach of a duty otherwise imposed by law or in recognition of public policy, such as

a duty under the general common law owed not only to the contracting parties but also to third parties and the public.").

"But wait!" Pathology Associates exclaims. Dr. Kennedy's claims *do* require reference to the Employment Agreement:

> [T]he trier-of-fact will necessarily need to consider the Employment Agreement when determining any liability for the alleged battery. If [Dr.] Kennedy was violating the employment schedule, it impacts the trier-of-fact's evaluation of their dispute. Such violation undermines and questions [Dr.] Kennedy's motivation for arguing with [Dr.] Slockett. It impacts [Dr.] Kennedy's credibility. It allows the trier-of-fact to believe that [Dr.] Kennedy was the aggressor in the dispute and acting unreasonably. It allows the trier-of- fact to evaluate whether [Dr.] Slockett was justified in wanting to end the dispute in his office.

Pathology Associates' "credibility" argument falls far from the mark. It invites us to ignore the nexus/significant relationship test. Dr. Kennedy seeks a judicial resolution of her tort claims, not an arbitrator's resolution of disputed leave time under the Employment Agreement. It cannot be the case that Dr. Slockett's allegedly violent outburst was the natural result of some polite discussion of a business matter.

Undeterred, Dr. Slockett urges us to consider *Phillips v. Lyons Heritage Tampa, LLC*, 341 So. 3d 1171 (Fla. 2d DCA 2022). We are unmoved.

In *Phillips*, 341 So. 3d at 1173-74, prospective homeowners sued a builder for damages arising from allegedly racially motivated delays in construction. The trial court compelled arbitration. *Id.* On appeal, we affirmed. *Id.* at 1178.

> Because the conduct underlying the claim is inextricably linked to the *performance* of the Building Agreement, resolution of the claim necessarily requires reference to it. . . .

Indeed, the very issue of whether a construction delay even occurred requires reference to the Building Agreement. That agreement, for example, provides that the builder will use its best efforts to complete construction of the custom home within 330 days from the start of construction. It also envisions some construction delays if certain events occur—for example, if the buyer requests any changes to the construction plan, such as changing the placement of a door or a window, the agreement provides for a one-month construction delay. The Building Agreement also includes a timeline of completion of construction that is based upon a payment schedule. . . . In sum, the Building Agreement envisioned that construction delays would result from the occurrence of certain circumstances, and reference to the contractual terms describing those circumstances would be necessary in any claim that is premised upon a construction delay.

*Id.* at 1176-77.

As is obvious, the claims in *Phillips* "necessarily require[d] reference to the [contract]'s terms." *See id.* Dr. Kennedy's claims do not.

## Conclusion

Dr. Kennedy's claims neither rely on the Employment Agreement nor refer to any provision therein. Her claims are unmoored to the Employment Agreement. In sum, her claims lack a sufficient nexus with, and a significant relationship to, the Employment Agreement.

We reverse the order compelling arbitration and remand for further proceedings consistent with this opinion.

Reversed and remanded.

VILLANTI and KHOUZAM, JJ., Concur.

_____

Opinion subject to revision prior to official publication.